USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1563

 UNITED STATES,

 Appellee,

 v.

 KRISTEN GILBERT,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Michael A. Ponsor, U.S. District Judge]

 

 Before

 Boudin, Circuit Judge,

 Bownes, Senior Circuit Judge,

 and Stahl, Circuit Judge.

 Harry L. Miles, with whom Green, Miles, Lipton, White &
Fitz-Gibbon, were on brief for appellant.

 William M. Welch, II, Assistant United States Attorney, with
whom Donald K. Stern, United States Attorney, were on brief for
appellee. 

June 21, 1999

 
 BOWNES, Senior Circuit Judge. Defendant-appellant
Kristen Gilbert was charged in a single-count indictment with
making a telephone bomb threat on September 26, 1996, to the
Department of Veteran's Affairs Medical Center (VAMC) in Leeds,
Massachusetts, in violation of 18 U.S.C. 844(e). Gilbert was
found guilty by a jury and was sentenced to imprisonment for
fifteen months and three years of supervised release. We affirm.
 There are three issues for review: (1) Was there subject
matter jurisdiction under the interstate commerce clause; (2) Did
the district court commit reversible error in the exclusion and
allowance of certain evidence; (3) Was the evidence sufficient
under the reasonable doubt standard to sustain the jury's finding
of guilt.
 I
 We state the facts as they could have been found by the
jury.
 Gilbert, a registered nurse, worked the 3:30 p.m. to
midnight shift on Ward C, an acute medical ward at the VAMC. James
Perrault was a VAMC police officer who worked the 3:00 p.m. to
11:00 p.m. shift at the medical center. In the summer of 1995
Gilbert and Perrault became friendly. The friendship blossomed
into a full-blown affair in September and October of 1995. At the
time Gilbert was married. In November, 1995, Gilbert filed for
divorce against her husband, Glenn Gilbert, and moved out of their
home. 
 In February, 1996, an investigation was launched at the
VAMC because of some suspicious occurrences at the hospital. The
investigation became an official criminal investigation in a few
months. Gilbert was one of the targets of the investigation. Many
employees at the VAMC were interviewed and grand jury subpoenas
were served on some employees.
 Gilbert was photographed and handwriting samples were
taken from her. Gilbert was upset by the investigation and made
her feelings known. She told her former husband (the divorce had
become final) that he had the right not to speak to the
investigators. After he had spoken to them anyway, she became
angry and upset. She disparaged him to several people by
belittling him and using epithets to denigrate him. Gilbert also
expressed anger and resentment against those of her co-workers who
cooperated with the investigation. She told a co-worker that
"maybe they ought to investigate" Gilbert's nursing supervisor. 
Gilbert became upset and angry with some of her co-workers on the
evening shift because they would not talk to a private investigator
she had retained.
 Gilbert talked about the investigation with Perrault. 
She told him that three nurses who worked in Ward C were
responsible for starting the investigation and she "couldn't
understand why they were trying to do this to me." Perrault
suggested leaving the area, but Gilbert refused, saying she "wanted
everybody here to see what they had done to ruin her life." 
Perrault tried to end their relationship in June of 1996, but she
begged him not to do so. In late July, 1996, Gilbert told a friend
of hers that if Perrault "dumped her, she probably would start
stalking him." Perrault tried again in late August of 1996 to
break his relationship with Gilbert. She became upset and blamed
the investigation for this.
 In September, 1996, Perrault told Gilbert of the day and 
time he had agreed to be interviewed in Springfield, Massachusetts, 
by investigators from the United States Attorney's Office. Gilbert 
became upset and begged Perrault not to attend the interview. On 
the day of the interview, Gilbert blocked Perrault's car with her 
car as he attempted to drive out of his driveway. She asked 
Perrault to talk to her and not to go to the interview. When 
Perrault made it clear that he would not do as she wished, she 
returned to her car and drove off. On arriving at Springfield, 
Perrault used a parking garage that he and Gilbert had used on 
prior occasions. When Perrault returned to his car after the 
interview he found that air had been let out of his right front 
tire.
 During the next several days Perrault's car was stained 
by egg yolks from eggs that had been thrown at it, the windshield 
was spray-painted, scratches were made on the exterior by keys, and 
the front license plate was damaged. After the damage to the 
license plate, Perrault saw a car similar in appearance to 
Gilbert's enter the parking lot that Perrault used. 
 Gilbert denied that she was responsible for the damage to
Perrault's car, but admitted she had been in the parking lot prior
to and after the bomb threat to the VAMC on September 26, 1996. 
Gilbert called a neighbor of hers on two occasions to ask if
Perrault had been checking on her. When told that Perrault had
inquired about her, the neighbor testified that Gilbert became very
angry and said, "Twit, fucking twit," in what the neighbor
described as a deep controlled tone of voice.
 Starting in mid-September Perrault received a number of
phone calls at his residence. There was no voice communication,
only heavy breathing or hang-ups. Perrault unsuccessfully tried to
trace the calls. He contacted NYNEX which traced seven of the
calls to Gilbert's telephone number. A pen register was installed
on Gilbert's phone on September 26, after the bomb threat. The pen
register showed that, between September 26 and October 1, 1996, 
about one half of Gilbert's phone calls to Perrault used a method
(called the "*67 function") which prevented Perrault from tracing
her calls from his own telephone.
 On September 26, the day of the bomb threat that was the
basis of the indictment, Gilbert purchased a "Talkgirl Jr." with
her VISA credit card at Toys-R-Us. She also bought several
packages of Energizer batteries from a Thrifty Drug Store about an
hour after the "Talkgirl Jr." purchase. The batteries could be
used to activate the "Talkgirl Jr." The toy is a hand-held voice
changer that records a statement which can be played back at a
higher or lower speed than the original recording. Words recorded
by a woman played back at a lower speed make them sound like a
man's voice.
 On September 26, the following message was received at
3:34 p.m. on the telephone answering machine of Glenn Gilbert,
divorced husband of defendant-appellant: "I just wanted to say
goodbye for the last time. Goodbye." Glenn Gilbert described the
voice as "an altered voice, an almost haunting voice."
 On September 26, Perrault was on patrol for two hours at
the VAMC and then took over the security desk at 5:00 p.m. 
Gilbert's neighbor saw her leave her apartment about 5:00 p.m. 
Gilbert knew that Perrault would be at the security desk for two
hours starting at 5:00 p.m. She also knew the direct dial
telephone number for the security desk.
 Perrault answered a security desk phone call at 5:11 p.m. 
A recorded message from an unidentified caller stated: "This
message is for all Persian Gulf veterans who were exposed to
chemical weapons." Perrault was a Persian Gulf War veteran and
Gilbert knew it. Perrault described the telephone voice as
"staticky, almost like there was a mechanical ring to it." 
Perrault dismissed the call as a prank.
 From 5:22 p.m. through 7:07 p.m. during the evening of
September 26, Perrault received a series of unidentified phone
calls at the security desk. He described the voice as being
exactly the same as the one directed to Persian Gulf veterans. The
messages received were as follows:
 Content of Messages Time
 "There are three explosive devices in 5:22
 Building One. You have two hours."

 "Nothing will compare as to what is
 going to happen tonight." 5:30
 
 "I want those patients out on time. 5:36
 Remember."

 "Would you like to know where to locate 5:40
 the devices?"

 Undiscernable. 5:45

 Undiscernable (small plane heard) 5:50

 "You sound dumb or you would go . . ." 5:55

 "You mustn't think this is very 6:10
 serious, just sitting in your office
 answering the phone."

 "You must be pretty stupid . . ." 6:18

 Undiscernable. 6:25

 "You find this exciting, don't you?" 6:48

 "This is my last call. In twenty-five 6:51
 minutes, I'll see you in hell."

 "It's your job to think about the 7:07
 patients. I do care, but the
 Government needs a message."

 All of the phone calls had the same ring pattern,
indicating that they were made from outside the VAMC. An officer,
other than Perrault, answered the 5:30 call. He described the
voice as distorted, not a normal voice "like some kind of tape
recorder."
 As a result of the bomb threat, fifty acutely ill
patients were moved by wheelchairs and stretchers from the building
containing Ward C and Ward C Annex to another building several
hundred yards away. No explosive devices were found in the
building.
 On the evening of September 27, Perrault received two
anonymous telephone calls while on duty at the security desk. He
described the voice as exactly like that of the caller on
September 26. Gilbert's telephone toll records did not show any
calls from her home at the time of the September 27th calls. 
 After listening again to the taped calls made on
September 26, Perrault noticed that certain tones of the caller
sounded very familiar. He described the caller as sounding hurt,
upset, taunting, provocative, cold, and unfeeling. He also noticed
that the calls seemed directed at him personally. He was of the
opinion that the caller was Gilbert.
 On September 28 and 29 Perrault was off from work and was
not on duty at the VAMC. No anonymous phone calls were received at
the VAMC on either of those days.
 On September 30, Gilbert told her neighbor (O'Donnell)
that she had gone to the Holyoke Mall and visited an Internet
coffee shop. She said that she had logged onto the Internet and
obtained a bomb recipe which she said was "easy to find."
 About 6:25 p.m. on the 30th, Gilbert bought a "Talkboy
Jr." and the batteries to run it at Toys-R-Us with a personal
check. Like the "Talkgirl" the "Talkboy" is a voice changer and
operates in the same manner. The cashier who sold the toy to
Gilbert remembered that Gilbert wanted to be sure that the
batteries worked with it and that Gilbert told her she wanted the
toy for her nephews. Gilbert does not have any nephews.
 At 6:44 p.m. on September 30, Perrault received a phone
call stating, "Officer Perrault, I've been watching you, boy." 
Perrault described the voice as the same as the one who made the
call on September 26, except that this time the caller appeared to
be "trying to put a southern drawl into it." Perrault received two
more calls on September 30. The caller sounded the same as the one
who had made the first call that evening.
 On the same evening, September 30, other departments at
the VAMC, i.e., Admissions and the Nurses' Station on Ward C, also
received unidentified phone calls. Those who received the calls
described the voice as sounding electronically altered or as a
mechanical-sounding voice.
 After finishing his shift on September 30, Perrault went
to the local Veterans of Foreign Wars (VFW) Club about midnight. 
Shortly after arriving he received a phone call at the bar. The
caller stated: "You think you have a problem? Just wait and see
what I have planned for you." Perrault recognized the voice as
being the same as the one in the prior phone calls. Gilbert knew
that Perrault usually stopped at that VFW on the way home from
work. In fact, she had met him there on several prior occasions,
without notice beforehand. On this same day, September 30,
Perrault received a letter from Gilbert in which she said that as
she drove by the VFW one evening she saw his car and stood outside
and watched him through a window playing darts.
 On October 1, 1996, Perrault met with investigators and
it was agreed that he would call Gilbert when he started his shift
on the security desk at 5:00 p.m. Surveillance of a number of pay
telephone booths in the vicinity of Gilbert's apartment was
arranged for that evening. Perrault called Gilbert at 5:12 p.m.
and left a message on her answering machine that he would be at the
security desk until 7:00 p.m. Perrault received a series of
anonymous phone calls at 5:25 p.m., 5:41 p.m., 5:44 p.m., and
6:37 p.m. The voice was the same as that of the prior anonymous
calls. Another officer on duty received an anonymous call at
7:35 p.m. He described the voice as strange, male-sounding and
distorted. The 5:41 p.m. and 5:44 p.m. calls were traced to
telephone pay stations at a Citgo gas station and the Daily
Hampshire Gazette. Gilbert later admitted to Perrault that she had
used those pay phones, but denied making any of the phone calls in
question.
 Shortly before the 6:37 p.m. pay-booth phone call,
Massachusetts State Trooper Kevin Murphy, who was on surveillance,
saw Gilbert arrive in her car at the Tasty Top, an ice cream stand,
and use the pay telephone booth outside of it. Trooper Murphy
radioed to Special Agent Plante (a member of the surveillance
team). Plante contacted Perrault at the VAMC security desk, who
confirmed that he had just received a call in which there was
traffic noise and heavy breathing noise.
 A fingerprint from Gilbert's right index finger was
lifted from the telephone receiver at the Tasty Top phone booth. 
Gilbert later told Perrault that she had made a phone call from the
Tasty Top booth to check her answering machine and that she had
seen a State Trooper at the Tasty Top. 
 On the evening of October 1, 1996, a search warrant was
executed at Gilbert's apartment. Trooper Murphy seized from the
trash three empty battery packages for Energizer batteries, two
batteries stamped LI54 on the back, and a Thrifty Drug Store
receipt showing the purchase of the Energizer batteries. Detective
Lieutenant Thomas Soutier also seized a "Talkboy" from a closet in
a child's room which contained a tape cassette that was blank. 
Agent Plante seized operating instructions for the "Talkboy" from
the left pocket of Gilbert's outdoor jacket, which Agent Plante
found lying on her bed. Agent Plante also found a Daily Hampshire
Gazette, dated September 27, 1996, on Gilbert's bed that contained
an article about the bomb threat.
 While the police were executing the search warrant,
Gilbert went over to her neighbor's (O'Donnell) apartment. Gilbert
told O'Donnell that the police were looking for a voice-changing
device, similar to a toy that her son owned, that "could change
your voice up high like a chipmunk or down low like a man." She
also told O'Donnell that if the police found such a device in her
house, it might be broken, the tape might be erased or blank, or
the batteries might be dead. The investigators never told Gilbert
that they were looking for a child's toy that could change a
person's voice. The VAMC did not receive any more telephone calls
from the anonymous caller after October 1st.
 Bruce Koenig, a government expert, tested the "Talkboy"
and determined that the variance in speed from low to high speed on
the "Talkboy" was 31.1%. Koenig increased the playback speed for
exhibit 13, the tape containing the September 30th phone calls, by
31.1%. The telephone calls on exhibit 13 were tape-recorded
messages; the messages had been pre-recorded on the "Talkboy", and
then played back at a slower speed. Mr. Koenig created a speed-
corrected tape of exhibit 13, which became exhibit 44. 
 One of Gilbert's friends, Ms. Abderhalden, who had known
and worked with Gilbert for over five years and had talked to
Gilbert daily in the fall of 1996, identified the voice on
exhibit 44 as Gilbert's voice, as did Glenn Gilbert her former
husband. 
 II
 We first turn to the interstate commerce-jurisdiction
issue. Gilbert argues that because there was no evidence "that the
telephone system used was more than an intrastate system, or that
the threat call was routed through an interstate system," there was
no effect on or nexus to interstate commerce. Appellant's Br. at
19. This claim is one of the many that have surfaced in the wake
of United States v. Lopez, 514 U.S. 549 (1995). And, as with most
of the others, the claim fails to float.
 Before starting our legal analysis, we address the
government's suggestion that Gilbert's claim was procedurally
defaulted and is reviewable only for plain error. We do not have
to resolve the issue because we do not think there was error, plain
or otherwise.
 We now proceed to our analysis of the interstate
commerce-jurisdictional question. The first paragraph of Lopez
summarizes the case:
 In the Gun-Free School Zones Act of 1990,
 Congress made it a federal offense "for any 
 individual knowingly to possess a firearm at a 
 place that the individual knows, or has 
 reasonable cause to believe, is a school 
 zone." 18 U.S.C. 922(q)(1)(A)(1988 ed.,
 Supp. V). The Act neither regulates a
 commercial activity nor contains a
 requirement that the possession be connected
 in any way to interstate commerce. We hold
 that the Act exceeds the authority of
 Congress "[t]o regulate Commerce . . . among
 the several States . . . ." U.S. Const., Art.
 I, 8, cl. 3.

Lopez, 514 U.S. at 551.

 Lopez does not apply because a telephone is an
instrumentality of interstate commerce and this alone is a
sufficient basis for jurisdiction based on interstate commerce.
 In Lopez itself the Court held:
 First, Congress may regulate the use of the 
 channels of interstate commerce . . . . 
 Second, Congress is empowered to regulate and
 protect the instrumentalities of interstate
 commerce, or persons or things in interstate
 commerce, even though the threat comes only
 from intrastate activities . . . . Finally,
 Congress' commerce authority includes the
 power to regulate those activities having a
 substantial relation to interstate commerce
 . . . , i.e., those activities that
 substantially affect interstate commerce. 

Id. at 558 (emphasis ours, cites and quotes omitted.) The Court
held that the statute at issue in Lopez fell into the third
category and could only be sustained "as a regulation of an
activity that substantially affects interstate commerce," id. at
559. In the present case, we are dealing instead with the second
category.
 Shortly after Lopez was decided the Court issued a per
curiam opinion in United States v. Robertson, 514 U.S. 669 (1995).
The case was brought under the Racketeer Influenced and Corrupt
Practices Act (RICO) on the basis that defendant had invested
proceeds obtained from unlawful acts proscribed by RICO, in the
purchase and operation of a gold mine. Section 1962(a) prohibits
the "acquisition of any interest in, or the establishment or
operation of, any enterprise which is engaged in, or the activities
of which affect, interstate or foreign commerce." 
 The Ninth Circuit reversed defendant's conviction on the
ground that the government had failed to prove that the gold mine
"was engaged in or affect[ed] interstate commerce." Id. at 670. 
The Court did not consider the "affecting" commerce question. It
pointed out that the evidence showed conclusively that the gold
mine itself was engaged in interstate commerce activities. These
activities "assuredly brought the gold mine within 1962(a)'s
alternative criterion of 'any enterprise . . . engaged in . . .
interstate or foreign commerce.'" Id. at 672. This case is not
precisely on point but it illustrates that "affecting interstate
commerce" is not the sole test to use in determining whether there
is interstate commerce jurisdiction.
 There are cases directly on point: United States v.
Kunzman, 54 F.3d 1522, 1527 (10th Cir. 1995), held: "As long as
the instrumentality used is itself an integral part of an
interstate system, Congress may regulate intrastate activities
involving the use of the instrumentality under the federal
securities laws." 
 The intrastate telephone call cases are of long standing
but like old wine have a pertinent robust taste. Loveridge v.
Dreagoux, 678 F.2d 870, 874 (10th Cir. 1982), held: "[P]roof of
intrastate telephonic messages in connection with the employment of
deceptive devices or contrivances is sufficient to confer
jurisdiction in a 10(b) and Rule 10b-5 action." In Alley v.
Miramon, 614 F.2d 1372, 1379 (5th Cir. 1980) the court held: "This
court has consistently held that the intrastate use of the
telephone may confer jurisdiction over a private action under
Section 10(b) and Rule 10b-5." In Kerbs v. Fall River Indus.,
Inc., 502 F.2d 731 (10th Cir. 1974) the court explained cogently
the reason for the telephone-call rule: 
 Both intrastate and interstate telephone 
 communications are part of an aggregate 
 telephonic system as a whole. And as long as 
 the instrumentality itself is an integral part 
 of an interstate system, Congress has power, 
 when necessary for the protection of 
 interstate commerce, to include intrastate 
 activities within its regulatory control.

Id. at 738 (citation omitted).
 The use of the telephone in this case to make a bomb-
threat was, without more, sufficient to sustain jurisdiction under
the interstate commerce clause.
 III
 The first evidentiary issue is rather unique and requires
explanation. Prior to the bomb threat, Gilbert and some others
were the subject of an investigation by the VAMC police and other
police agencies. The investigation was prompted by unexpected
deaths at the VA hospital. That there was an ongoing investigation
was common knowledge at the VAMC and in the outside community. 
 Prior to trial, the district court discussed with counsel
how to handle the introduction of the fact that there was an
investigation going on and that Gilbert was one of those being
investigated. The court told counsel that he would not exclude
entirely the fact that there was an investigation in process
because the case "flowed" around the investigation. After a
lengthy pre-trial conference on the instructions to be given to the
jury, the following instruction was given at the outset of the
trial:
 Here is my preliminary instruction to you. 
 I want to instruct you now on part of the 
 background of this case. Beginning around 
 February 1996, seven months before the bomb 
 threat charged by the Government in this case, 
 an independent investigation began about 
 certain possible wrongdoing at the VA. 

 That separate investigation had nothing to 
 do with the charge in this case. The supposed 
 wrongdoing involved something else entirely. 
 For a time that separate investigation 
 included within its scope, among other people 
 and things, the defendant here Kristen 
 Gilbert.

 I'm not going to tell you about the 
 specifics of that other separate suspected 
 wrongdoing because to do so would give that 
 supposed misconduct more weight than it 
 deserves. I have also instructed counsel not 
 to refer to the specifics of that 
 investigation. I do want to emphasize a 
 couple points however.

 Nearly two years after that separate 
 investigation first began, there is still no 
 sufficient evidence that any wrongful act was 
 ever committed by anyone.

 Moreover, although at some point the 
 investigation turned in part towards this 
 defendant, Ms. Gilbert has never been charged 
 with the wrongdoing that was the subject of 
 that separate investigation. So as far as 
 this trial is concerned, even assuming that 
 the other wrongdoing ever actually occurred, 
 she is not only entirely innocent of that 
 separate misconduct, she has not ever been 
 charged with it.

 The fact that there was an investigation, 
 however, and that for some time it included 
 the defendant, among other persons and things 
 within its scope, is part of the background of 
 this case. You may hear references to that 
 investigation, and I am therefore permitting 
 you to know of the fact of that separate 
 investigation.

 Do not speculate about the subject matter 
 of that separate investigation. It doesn't 
 matter. Such speculation might distract you 
 from your task in this trial, which is to 
 determine whether the Government has proven 
 beyond a reasonable doubt that the defendant 
 phoned a bomb threat to the VA on
 September 26, 1996.

 Keep in mind as well that the fact that a 
 person is investigated for some separate 
 wrongdoing is not evidence of any kind that 
 the person is guilty of the crime they have 
 actually been charged with.

 You should not, as a matter of law and as a 
 matter of fundamental fairness, assume in any 
 way that Ms. Gilbert is or might be guilty of 
 phoning in a bomb threat simply because she 
 happened to fall within the scope of a 
 separate investigation involving something 
 entirely different. The fact that she was 
 included for a time in that separate 
 investigation is simply not evidence against 
 her in this case in any way.

 As I have said, I am permitting the 
 evidence of the existence of that separate 
 investigation to come in this limited form 
 simply to give you the background and context 
 out of which the evidence in this case partly 
 arises. Consider this evidence only in this 
 light.

 Gilbert took the position at trial that evidence of the
other investigation should not have been admitted at all. She
argues before us that its admission violated the provisions of Fed.
R. Evid. 404(b), was an abuse of discretion, and deprived her of a
fair trail. The government counters that the evidence was properly
admissible under Fed. Rules of Evidence 401 and 403 and "in the
alternative" under Fed. R. Evid. 404(b).
 Prior to giving the jury instruction the court made the
following rulings. It expressed doubt that the investigation
evidence 
 constitutes the sort of other-act evidence 
 that falls within the scope of Rule 404(b). I 
 think the fact is that the evidence of the 
 other investigation is connected to this case 
 in a way that really makes it part of the 
 Government's proof of the actual act that has 
 been charged.

 This isn't a pure other-act type of
 situation where, for example, the Government
 would be trying to prove that the defendant
 engaged in some kind of misconduct two or
 three years ago and therefore is likely to be 
 guilty or possibly guilty of the charge that 
 she's facing here at this time.

 The court then acknowledged that it might be wrong about
Rule 404(b)'s applicability and stated that it was "going to make
a finding under Rule 404(b) to cover the situation:" 
 I want to make it clear that in permitting 
 evidence of the other investigation to come 
 in, I do find that it has special relevance in 
 this case both on the issues of motive and 
 identity, and that special relevance is 
 entirely separate from any improper purpose 
 that the evidence might be offered for, 
 meaning propensity evidence.

 I believe also that the probative value of 
 the evidence outweighs any unfair prejudice 
 that will be done to the defendant as a result 
 of my letting this in, particularly in the 
 context of the limiting instruction that I 
 will give.

 So I want to make sure that my specific 
 findings are on the record to the extent that 
 we are in the area of Rule 404(b). I also
 want to make it clear because this is close to
 404(b) that I'm approaching it as if it were
 404(b) evidence in assessing the probative
 weight versus the unfair prejudice.

 We start our analysis with the three evidentiary rules
implicated. Rule 401 defines relevant evidence. Rule 403 provides
for the exclusion of relevant evidence on the grounds of prejudice,
confusion or waste of time. The pertinent part of Rule 404(b)
states:
 (b) Other crimes, wrongs, or acts. 
 Evidence of other crimes, wrongs or acts is 
 not admissible to prove the character of a 
 person in order to show action in conformity 
 therewith. It may, however, be admissible for 
 other purposes, such as proof of motive, 
 opportunity, intent, preparation, plan, 
 knowledge, identity, or absence of mistake or 
 accident.

 Our standard of review of a district court's admission or
exclusion of evidence is abuse of discretion.
 We review a trial court's Rule 403 balancing 
 test for an abuse of discretion, and only in 
 "extraordinarily compelling circumstances" 
 will we reverse a district court's "on-the- 
 spot judgment" concerning the probative value 
 and unfair effect of the proffered evidence. 

United States v. Shea, 159 F.3d 37 (1st Cir. 1998); United States
v. Pitrone, 115 F.3d 1, 7 (1st Cir. 1997).
 We do not think that the investigation evidence is barred
by either Rule 403 or Rule 404(b). As the district court pointed
out, it could be described as part of the proof that Gilbert was
the one who made the telephone bomb threat. The jury could well
have found that her reaction to the investigation as shown by what
she said and did was the motive for the bomb threat. And proof of
motive is one of the purposes for admitting evidence that would be
otherwise excludable under Rule 404(b). Thanks to the admirable
instruction given the jury on this matter and the rulings made in
conjunction with it by the district court, we need go no further. 
We hold that the other investigation evidence was properly
admitted.
 The next evidentiary issue is more troublesome. It
involves the admissions of expert testimony that resulted in the
positive voice identification of Gilbert as the person who made the
telephone calls on September 30, 1996 (subsequent to the bomb
threat calls on September 26). Gilbert argues that the admission
was erroneous for three reasons: (1) ambush, abuse of discretion,
and deprivation of a fair trial; (2) the voice identifications were
unduly suggestive, inherently unreliable, and constituted an abuse
of discretion; (3) the trial court's refusal to give an adverse
inference instruction constituted reversible abuse of discretion. 
 The procedural history of the voice identification is
important. We first note that there was no mention of a positive
identification of Gilbert's voice in the government's opening. We
start our recital of the facts underlying this issue by pointing
out that what took place is based in part on the representations of
the prosecutor which the court obviously accepted. We make no
suggestion that the prosecutor misrepresented the facts or the
court erred in accepting the prosecutor's representations.
 Trial started on Wednesday, January 7, 1998. On the
weekend prior to trial, the prosecutor was "fooling around" with
exhibit 13 on a play back tape recorder. Exhibit 13 consisted of
tape recordings of phone calls made on September 30. Perrault
received three phone calls during the evening of September 30. The
voice on all three calls sounded the same to Perrault. On the same
evening, there were unidentified phone calls made to various
departments of the VAMC. The testimony of the recipients was that
the voice sounded as being electronically altered or was a
mechanical sounding voice.
 As the prosecutor "fiddled" with the tape recorder that
held exhibit 13, he became aware that when the play back speed of
the recorder was increased that Gilbert's natural voice was heard. 
This discovery was confirmed on January 6. On January 7, after the
trial started, the government sought to have Gilbert's ex-husband
Glenn Gilbert, identify defendant's voice by playing exhibit 13 on
a voice transmitter with a variable speed adjustment. The court
sustained Gilbert's objection, subject to a change of ruling if the
government obtained an expert witness. The court was of the
opinion that allowing the government to vary the speed of the play
back to obtain Gilbert's natural voice would be unreliable and too
haphazard.
 The government promptly contacted an expert, Bruce
Koenig, who was in the business of analyzing audio and video tapes. 
Preparatory to testifying, he speeded up the play back so that
Gilbert's natural voice was heard. This was recorded on another
tape, exhibit 44. It must be borne in mind that part of the
government's theory on the voice identification issue was that
Gilbert had made the September 30 phone calls on the "Talkboy"
recorder that she bought on September 30 at 6:25 p.m. at Toys-R-Us.
 Koenig delivered the tape he created (exhibit 44) to the
government on Sunday, January 11, which immediately provided the
defense with a copy of it and a statement of Koenig's proposed
testimony.
 On Monday, July 12, the prosecutor proffered Koenig as a
witness. Gilbert objected on the grounds already stated. She also
pointed out that she would be severely prejudiced because of the
short amount of time she had to prepare for his testimony.
 The court decided to admit the evidence but gave Gilbert
several options among which was a short continuance. Gilbert
declined the continuance but accepted the court's offer to allow
her expert to testify out of order. Gilbert was also given an
opportunity to voir dire Koenig, which she did for ninety minutes.
 On January 13, Gilbert called her expert, Christopher
Ryan. Ryan was a full-time musician, master engineer, and record
producer. His testimony was that, after listening to the "Talkboy"
tape, he was of the opinion that it was incapable of producing the
conversation recorded on exhibit 44.
 Koenig, the government's witness, testified as to how he
had tested the "Talkboy" for variances in speed and then created a
speed corrected tape of exhibit 13 which became exhibit 44.
 There was testimony by two witnesses, a long time friend
of Gilbert and Gilbert's ex-husband, that the voice on exhibit 44
was that of defendant.
 We do not doubt that Gilbert was surprised by the
positive voice identification testimony. We do not think, however,
that she was ambushed by it, if we define ambush as the government
deliberately laying a trap for her to walk into. If the events
leading to the discovery that speeding up of the September 30 tape
recordings disclosed Gilbert's natural voice were as the prosecutor
stated, there was no ambush, just a fortuitous discovery by the
prosecutor the weekend prior to start of the trial. And even if we
were skeptical about the prosecutor's assertion, we would be bound
by the district court's decision to admit the evidence. "A
district court's denial of a motion to suppress will be upheld if
any reasonable view of the evidence supports the denial." United
States v. Watson, 76 F.3d 4, 6 (1st Cir. 1996). United States v.
de Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993). And the standard
of review of discovery decisions is abuse of discretion. United
States v. Samalot-Perez, 767 F.2d 1, 4 (1st Cir. 1985). 
 We think that the district court's handling of this
surprise evidence treated Gilbert fairly under the circumstances. 
She eschewed the offer of a short continuance and opted instead to
put on her own expert out of order. The prosecutor had given her,
as soon as it was available, a statement of the testimony of its
expert that would be proffered at trial. And Gilbert was accorded
an extensive voir dire of the government's expert before he
testified before the jury. Significantly, Gilbert does not state
how she was prejudiced by the late disclosure of the voice
identification testimony or how it would have changed her defense
strategy. United States v. Melucci, 888 F.2d 200, 203 (1st Cir.
1989).
 Moreover, Gilbert had been furnished a copy of exhibit 13
over a year prior to trial. She certainly had an opportunity to
have her expert perform as many tests on it as necessary.
 Gilbert also argues on appeal that the court erred in not
excluding Koenig's testimony on the grounds that it was scientific
evidence and did not pass the reliability and validity tests of
Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590-93
(1993). The short answer to this argument is that there was no
objection in the trial court on this basis. No suggestion was made
by Gilbert that the Daubert principles should be applied to
Koenig's testimony. Our rule is that an objection not made in the
trial court will not be considered in the first instance on appeal. 
Cooperman v. Individual, Inc., 171 F.3d 43, 49 (1st Cir. 1999);
Albion v. YMCA Camp Letts, 171 F.3d 1, 2 (1st Cir. 1999).
 Gilbert's second contention is that the voice
identifications were unduly suggestive and their admission an abuse
of discretion because the witnesses already knew Gilbert's voice
but were not given comparisons of tape recordings of other voices. 
In addition, both witnesses had listened to exhibit 44 prior to
testifying and identified the voice as that of Gilbert. For these
reasons, Gilbert says that the trial judge should have excluded the
identifications in this case.
 While there were certainly suggestive elements in this
procedure, the Supreme Court has made clear that this does not
violate due process if the identification remains sufficiently
reliable, see Manson v. Braithwaite, 432 U.S. 98 (1977), cf.
Government of Virgin Islands v. Sanes, 57 F.3d 338 (3d Cir. 1995). 
Here, the witnesses were both familiar with Gilbert's voice and
therefore had a solid basis for their opinion that the taped voice
was Gilbert's, and the defense was free to bring out on cross-
examination any aspects of suggestiveness, including the pretrial
exposure of the witnesses to the tape. This was a judgment call by
the district court under an abuse of discretion standard, and we do
not think that the discretion was abused.
 Moreover, there was sufficient evidence for the jury to
convict without the voice identification of the September 30
"Talkboy" telephone calls. We summarize the evidence, omitting the
voice identification testimony. 
 Gilbert purchased a "Talkgirl Jr." about three and one
half hours before the bomb threat calls to the VAMC on the evening
of September 26, 1996. The "Talkgirl Jr." could make a woman's
voice sound like that of a man. Gilbert left her apartment eleven
minutes before the first bomb threat calls were received at the
VAMC. She did not return home for about three hours.
 After listening to the tape recordings of the ten phone
calls made on the evening of September 26, 1996, the first of which
was the bomb threat, Perrault believed that they all were made by
Gilbert. She admitted to Perrault that she watched from across the
street as the building which the caller said "contained three
explosive devices" was evacuated. 
 Personnel at the VAMC and Perrault received a number of
unidentified phone calls over the next several days. The calls
were made by someone who knew Perrault's work schedule, which
Gilbert did. Some of the calls to Perrault were of a personal
nature. Perrault believed that the voice on these calls was the
same as the one that had made the bomb threat calls.
 On September 27th, Gilbert purchased a "Talkboy Jr."
which like the "Talkgirl Jr." could make a woman's voice sound like
that of a man. She told the clerk from whom she made the purchase
that it was a gift for her nephews. Gilbert does not have any
nephews. The VAMC received an unidentified phone call about 15
minutes after the purchase. The caller's voice sounded the same as
the other calls.
 On October first, it was decided to conduct a
surveillance of a number of pay phone booths in the vicinity of
Gilbert's apartment. Perrault agreed to call Gilbert from the
security desk at VAMC, which he did at 5:00 p.m. At 6:37 p.m. the
VAMC received an unidentified phone call in the same voice as the
others. At the same time Gilbert was observed by a state trooper
making a phone call from a pay phone booth near her apartment. A
fingerprint from Gilbert's right index finger was lifted from the
receiver at the phone booth.
 A warrant-authorized search was made of Gilbert's
apartment during the evening of October 1. A "Talkboy Jr." and
other incriminating evidence was seized.
 This evidence was sufficient without the voice
identification evidence for a conviction. Because, however, the
admission of the voice identification was not error, we need not
decide whether it would have been harmless error.
 The judgment of the district court is affirmed.