Steven G. COOPERMAN, et al.,
Plaintiffs, Appellants,

v.

INDIVIDUAL INC., et al., Defendants,
Appellees.

No. 98–1730.

United States Court of Appeals,
First Circuit.

Heard Dec. 10, 1998.

Decided March 22, 1999.

Rehearing Denied April 14, 1999.

Robert P. Sugarman, with whom David J. Bershad, Janine L. Pollack, Milberg Weiss Bershad Hynes & Lerach LLP, Glen DeValerio, Jeffrey C. Block, Matthew E. Miller and Berman, DeValerio & Pease LLP were on brief, for appellants.

Brian E. Pastuszenski, with whom Stephen D. Whetstone, Robert Noah Feldman and Testa, Hurwitz & Thibeault, LLP were on brief, for appellee Individual Inc.

Thomas J. Dougherty, with whom Matthew J. Matule, Skadden, Arps, Slate, Meagher & Flom LLP were on brief, for appellee Managing Underwriters.

Before TORRUELLA, Chief Judge, STAHL and LYNCH, Circuit Judges.

TORRUELLA, Chief Judge.

Six plaintiffs, purchasers of common stock of Individual, Inc. ("Individual" or "the Company"), brought suit under sections 11 and 15 of the Securities Act of 1933 (the "1933 Act") against Individual, its board members, and the underwriters who participated in Individual's March 1996 initial public offering ("IPO"). Plaintiffs claim that defendants made materially false and misleading statements and omitted material facts in connection with the registration statement and prospectus for the IPO.[1] The focus of plaintiffs' claim is that defendants improperly failed to disclose that, at the time the IPO became effective, a conflict existed between Yosi Amram ("Amram")—the director, founder, chief executive officer and president of Individual—and a majority of the board of directors about the strategic direction the company should take. The complaint alleges that, as a result of this conflict, Amram left Individual, causing the price of the Company's stock to fall sharply. It is claimed that failure to disclose this conflict in the registration statement and prospectus is an omission of a material fact which renders defendants liable for the damages allegedly suffered.

On April 15, 1997, defendants moved to dismiss plaintiffs' claims for failure to state a claim. In a Memorandum and Order dated May 27, 1998, the district court granted defendants' motions in their entirety. This appeal followed.

---

1. Throughout this opinion we will use the terms "registration statement" and "prospectus" interchangeably as it appears that the pertinent information contained in the registration statement is identical to that contained in the prospectus.

## I. BACKGROUND

### 1. Individual's Business

Individual is in the business of providing electronic customized information services. The Company searches tens of thousands of news sources each day and delivers to its customers personalized packages of news stories by facsimile, e-mail, the Internet, and other network systems. Individual serves enterprises as well as individual users. The Company is supported primarily by revenue from subscriptions paid by its users. Amram founded Individual in 1989 and was largely responsible for its rapid growth from a start-up to a public company. Until August 1996, Amram served as a director, president and CEO of Individual.

### 2. The Registration Statement and Prospectus

On January 31, 1996, Individual publicly announced that it had filed a registration statement with the Securities and Exchange Commission ("SEC") for an initial public offering of 2.5 million shares of common stock. The SEC declared the registration statement effective on March 15, 1996 and 2.5 million shares were offered to the public at a price of $14 per share.

Plaintiffs allege that at the time the registration statement became effective there was a substantial disagreement between Amram ... and a majority of the Board members ... as to the strategic direction of the Company. Amram believed that the Company should grow and expand through rapid, often costly, acquisitions of new businesses. The majority of the Board, however, believed that Individual should grow through building its core business through, among other things, the growth of its subscriber base, the expansion of its information base and providers, and enhancement of its knowledge processing systems. Prior to the Offering, a

majority of the Board was greatly concerned about, and firmly opposed to, Amram's growth through acquisition strategy.

The prospectus did not disclose the existence of any disagreement between Amram and the majority of the Board. Instead, the prospectus stated that the Company's future objective was "to build the industry's leading 'open information exchange' .... [by] enhanc[ing] its knowledge processing systems and expand[ing] its base of participants." The description in the prospectus thus mirrors the complaint's description of the majority of the Board's strategy: growth through development of Individual's existing core business.

### 3. Post–Public Offering Developments

The price of Individual's stock rose rapidly in the period after the IPO due to the Company's announcements of new strategic alliances with Microsoft and Toshiba. In addition, on April 23, 1996, Individual announced its first quarter results, as well as a 233% increase in its number of users. In the aftermath of these announcements, Individual's stock price rose from $16 to $20 per share in just three days—a total increase of over twenty-two percent.

### 4. Amram's Departure

On July 24, 1996, Individual announced that Amram was taking an "indefinite leave of absence" from the Company due to a disagreement with the Board over "the pace of acquisitions." Robert Lentz, Individual's CFO, explained that Amram wanted the Company to move faster in making acquisitions and investments as the Internet's popularity exploded. Immediately after the announcement of Amram's leave, the price of Individual stock fell 37% from the previous day's close of $9.50 per share to $6 per share.[2]

2. On the same day, the Company also announced that two other Board members had resigned. According to the announcement, Manuel A. Fernández resigned due to a conflict of interest between Individual and his own company, while Frank A. Ingari resigned due to heavy demands on his time.

A July 25, 1996 Bloomberg News report confirmed that Amram's departure was due to the fact that Amram wanted to augment the speed and breadth of Individual's acquisitions and investments, while the majority of the Board strongly opposed such a strategy. On July 30, 1996, then-acting chairman of Individual, William A. Deveraux, also attributed Amram's departure to his frustration with the Board's position that it was inappropriate to pursue venture capital activities using Individual's funds and resources. Devereaux reiterated that the Board's plan, as described in the prospectus, was to pursue strategically moderate deals, which could easily be integrated into the Company's core business.

On August 7, 1996, Amram issued a public statement that he would resign as CEO in protest over the Board's actions during the prior two weeks. According to the complaint, those actions included his dismissal without notice after he informed other directors of his plan to establish another company, "Free Spirit Holdings," to invest in the entertainment, media and health care industries. Amram planned to contribute 100,000 shares of Individual stock to Free Spirit Holdings and wanted the Company to contribute another 100,000 shares. The Board rejected this proposal. At the end of the day, the Board announced that it had terminated the employment of Amram, although he still remained a member of the Board.

The next day, on August 8, Amram announced that he had quit his position with the Company but that he would fight to regain leadership. On August 9, Richard Vancil, Individual's vice president of marketing, explained Amram's departure: "There was a divergence of strategy. Yosi wanted rapid and multiple acquisitions and the board was focusing on growing the core business." Vancil further stated that "Amram's strategy was more in line with a venture capital strategy."

### 5. Proceedings Below

In the proceedings below, plaintiffs claimed that defendants' failure to disclose the conflict between Amram and the majority of the Board at the time the IPO became effective violated sections 11 and 15 of the 1933 Act. After concluding that the complaint adequately alleged that such a conflict in fact existed at the time of the IPO, the district judge found that: (1) the alleged omission was material; and (2) although material, there was no duty to disclose.

On appeal, plaintiffs challenge the district judge's conclusion that, as a matter of law, defendants were under no duty to disclose the material fact of the Board-level dispute. Defendants challenge the district judge's threshold determination that the allegations in the complaint "barely—but sufficiently" support an inference that the Board-level conflict existed as of March 15, 1996—an essential element of plaintiffs' claim. Defendants also contest the district judge's determination of materiality, claiming that, even if the alleged conflict existed as of March 15, 1996, its omission was immaterial as a matter of law.

## II. DISCUSSION

### 1. Standard of Review

We review the dismissal of plaintiffs' amended consolidated complaint de novo. *See Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir.1997). We accept as true all well-pleaded allegations and give plaintiffs the benefit of all reasonable inferences. *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 991 (1st Cir.1996). Dismissal under Fed.R.Civ.P. 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery. *See Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989).

Section 11 imposes liability on signers of a registration statement and on underwriters, among others, if the registration statement, at the time it became effective, "con-

tained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Thus, to avoid dismissal of their § 11 claim, plaintiffs must successfully allege: (1) that Individual's prospectus contained an omission; (2) that the omission was material; (3) that defendants were under a duty to disclose the omitted information; and (4) that such omitted information existed at the time the prospectus became effective. *See id.*

### 2. Standing

We first address the threshold issue of standing. Defendants contend that plaintiffs lack standing to assert their § 11 claim.[3] Specifically, defendants argue that § 11 relief is only available to those individuals who purchase their shares directly through the IPO subject to the registration statement at issue.[4] According to the complaint, three of the six plaintiffs did in fact purchase their shares directly through Individual's March 15, 1996 IPO. Thus, even accepting defendants' argument, these three plaintiffs would have standing to assert a § 11 claim. In any event, because we are affirming the district court's dismissal of the plaintiffs' § 11

claims on other grounds, we need not resolve the standing issue.[5]

### 3. The Existence of a Board-level Conflict as of March 15, 1996

 We next address defendants' claim that the complaint does not adequately allege an essential element of plaintiffs' claim.[6] Specifically, defendants argue that the uncontested fact that a Board-level dispute about the strategic direction of the Company existed in July 1996 is not enough to support the inference that the conflict existed on March 15, 1996, the date the prospectus became effective.

 As discussed above, in the context of a Rule 12(b)(6) motion, the demands on the pleader are minimal. "Nevertheless, minimal requirements are not tantamount to nonexistent requirements." *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988). To survive a motion to dismiss, plaintiffs must set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Id.* at 515. This court has previously plotted the dividing line between adequate "facts" and inadequate "conclusions": "it is only when ... conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what

---

3. We note that defendants' claim is one of statutory standing only and thus the jurisdiction of this court is not at issue. *Cf. Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998).

4. Section 11 provides:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue [persons who are signatories, directors or partners of the issuer, professional advisors

such as accountants, engineers or appraisers, or underwriters].
15 U.S.C. § 77k(a).

5. Indeed, defendants assert their standing argument in the alternative: "If and only if this Court should reverse the District Court on the prior question, we ask that it also reverse the District Court's determination that plaintiffs have standing to assert claims under Section 11."

6. We note at the outset that because plaintiffs' claim does not "sound in fraud," the heightened pleading requirements of Fed.R.Civ.P. 9(b) do not apply. *See* Fed.R.Civ.P. 9(b); *Shaw v. Digital*, 82 F.3d 1194, 1223 (1st Cir. 1996). Defendants have not argued that the heightened pleading requirements of Rule 9(b) apply and have not moved for dismissal on that ground.

experience indicates is an acceptable level of probability, that 'conclusions' become 'facts' for pleading purposes." *Dartmouth Review,* 889 F.2d at 16. We thus examine plaintiffs' factual allegations to see if they support the conclusions pled.

Plaintiffs allege that the July 24, 1996 announcement of Amram's decision to take a leave of absence—just four and one-half months after the IPO—supports the "conclusion" that a Board-level conflict existed at the time of the IPO. To further support this conclusion, plaintiffs point to news reports published on July 25, 1996, and August 9, 1996, attributing Amram's departure to a "divergence of strategy" between Amram and the majority of the Board. The July 25 report further suggested that the conflict between Amram and the Board was not of recent origin: "It's hard to make headway in a battle if the Company's direction is still a matter of debate."

Plaintiffs' factual allegations clearly support the contention that a conflict between Amram and the Board existed in July 1996. The more difficult question is whether these allegations also support the inference that this conflict existed as early as March 15, 1996.

In *Gross v. Summa Four, Inc.,* this court upheld the dismissal of a securities complaint on the ground that references in the minutes of a June 14 board meeting to delays in orders that the company was receiving at that time did not support the inference that the Company knew about those delays at the time of its May 3 press release. *See* 93 F.3d at 995. The court emphasized that the June 14 board meeting was held five weeks after the company issued its May 3 press release. *See id.* Defendants argue that, in light of *Gross,* plaintiffs' allegations of a conflict four and one-half months after the IPO, cannot, as a matter of law, support the inference that the conflict existed at the time of the IPO.

We disagree. We believe that the departure of the president, CEO and founder of the Company—just four and one-half months after the IPO—is fundamentally different from a delay in customer orders, the situation presented in *Gross.* Our "experience indicates," *Dartmouth Review,* 889 F.2d at 16, that Board-level conflicts, like the one that existed in July 1996, "do not arise or disappear overnight." Memorandum and Order at 21.[7] We agree with the district court that plaintiffs' suggested inference rises to "an acceptable level of probability." *Dartmouth Review,* 889 F.2d at 16.

Moreover, although we recognize the strong public policy against allowing discovery in securities cases filed without a substantial factual basis, *see* Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u, we are also mindful of the procedural posture of this case: all discovery has been stayed pending defendants' motion to dismiss.[8] "[W]e cannot hold

---

7. Defendants argue that the Company's announcement, just ten weeks after the IPO, that it had entered into an agreement to acquire Freeloader, Inc., a company that was not complementary to Individual's core business, directly undermines the time-based inference that plaintiffs seek to draw. Giving plaintiffs the benefit of all reasonable inferences, however, we note that the Freeloader acquisition could indeed support plaintiffs' position. As the complaint alleges, the Freeloader acquisition was "particularly characteristic of Amram's costly and potentially risky rapid acquisition strategy." Indeed, the acquisition of Freeloader directly contradicted the statements in the prospectus regarding the Company's strategic objectives and business model. The fact that a majority of the

Board approved this acquisition just ten weeks after issuing those statements further suggests—as plaintiffs contend—that the Individual Board was conflicted and confused about the strategic direction of the Company at the time of the IPO.

In any event, as the district court noted, this argument relies on the same time-based inference that defendants would have us deny to plaintiffs. Given the procedural posture of this case, we must draw all reasonable inferences in favor of plaintiffs.

8. The procedural posture of this case is thus different from the cases on which defendants rely in their brief. In *Gross,* the district court granted plaintiffs limited discovery before dis-

plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence." *Digital*, 82 F.3d at 1225. We thus affirm the district court's finding that plaintiffs' complaint adequately alleged the existence of a Board-level conflict as of March 15, 1996, the date the IPO became effective.

### 4. Materiality of Omitted Fact

 We next address defendants' challenge to the district judge's determination of materiality. Defendants argue that, even if the conflict between Amram and the majority of the Board existed at the time of the IPO, Individual's omission of this conflict from the prospectus was immaterial as a matter of law.

This court has delineated the boundaries of materiality in the securities law context:

> The mere fact that an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement. Rather, information is "material" only if its disclosure would alter the "total mix" of facts available to the investor and "if there is a substantial likelihood that a reasonable shareholder would consider it important" to the investment decision.

*Milton v. Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir.1992) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). We agree with the district court that it is substantially likely that reasonable investors would consider the existence of a Board-level conflict over the future direction of the Company important to their investment decision.

In reaching this conclusion, we are mindful of our role in making determinations of materiality:

> Although materiality is a mixed question of law and fact which the trier of fact ordinarily decides ... if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are inactionable as a matter of law.

*In re Donald J. Trump Casino Securities Litig.*, 7 F.3d 357, 369 n. 13 (3d Cir.1993) (internal quotation marks and citations omitted). We cannot characterize the conflict between Amram and the Board as "obviously unimportant" to a reasonable investor.

### 5. Duty to Disclose

 Given our determination that the omission of the alleged Board-level conflict was material, the question remains whether defendants had a duty to disclose this "material fact" in the Company's registration statement.

 In *Digital*, this court reiterated the well-settled proposition that "the mere possession of material nonpublic information does not create a duty to disclose it." *Digital*, 82 F.3d at 1202. Although in the context of a public offering there is a strong affirmative duty of disclosure, it is clear that an issuer of securities owes no absolute duty to disclose all material information. *See id.* The issue, rather, is whether the securities law imposes on defendants a "specific obligation" to disclose

---

missing their complaint. *See* 93 F.3d at 990. In *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir.1996), the plaintiffs' complaint was only dismissed after three years of litigation and full discovery. *See id.* at 628. Indeed, the *Glassman* court specifically highlighted this fact: "We are mindful that this case comes to us after three years of litigation and full discovery. We thus look more closely at the factual allegations to see if they support the legal conclusions pled." *Id.* Such height-

ened scrutiny is not appropriate in the instant case. Finally, the third case that defendants rely on in their brief involves a dismissal for failure to satisfy the heightened pleading requirements of Rule 9(b). *See Suna v. Bailey Corp.*, 107 F.3d 64, 71 (1st Cir.1997). It does not necessarily follow that the plaintiffs' complaint would also fail to satisfy the less stringent requirements of Rule 12(b)(6), which apply to the complaint in the instant case.

information of the type that plaintiffs claim was omitted. *Id.* at 1202. We thus look to the explicit language of section 11 to determine whether it imposes on defendants a "specific obligation" to disclose the Board-level conflict that allegedly existed on March 15, 1996.

The *Digital* court set out the circumstances in which section 11 imposes a duty of disclosure:

> Section 11 by its terms provides for the imposition of liability if a registration statement, as of its effective date: (1) "contained an untrue statement of material fact"; (2) "omitted to state a material fact required to be stated therein"; or (3) omitted to state material fact "necessary to make the statements therein not misleading."

*Digital,* 82 F.3d at 1204 (quoting 15 U.S.C. § 77k(a)). Plaintiffs base their claim of nondisclosure on the second and third prongs of the statute. Specifically, plaintiffs claim that: (1) the existence of the Board-level conflict was a material fact required to be stated therein; and (2) disclosure of the Board-level conflict was necessary to make other statements in the registration statement not misleading.

■ Plaintiffs base their first argument on Regulation S–K, Item 101(a), which identifies some of the information "required to be stated" in registration statements. *See* 17 C.F.R. § 229.101(a). Item 101(a) requires an issuer, in the context of an IPO, to "[d]escribe the general development of the business of the registrant." 17 C.F.R. § 229.101(a). Plaintiffs argue that Item 101(a) by its terms "required" the disclosure of the alleged Board-level dispute as to the development of Individual's business. Plaintiffs raise this argument for the first time in a footnote of their appellate brief. By failing to raise the applicability of Item 101(a) in the dis-

trict court, plaintiffs have waived this argument. "Our law is clear that a party ordinarily may not raise on appeal issues that were not seasonably advanced (and, hence, preserved) below." *See Daigle v. Maine Medical Center, Inc.,* 14 F.3d 684, 687 (1st Cir.1994). We thus turn to plaintiffs' second argument.

This argument is to the effect that defendants had a "specific obligation" to disclose the Board-level conflict because its omission rendered affirmative statements in the registration statement misleading. In making this argument, plaintiffs point to two sections of the registration statement: (1) the "business model" section, and (2) the "use of proceeds" section.[9]

The "business model" section of the prospectus states that the Company's objective is:

> to build the industry's leading 'open information exchange' linking a growing base of knowledge workers to relevant information providers and advertisers. The Company believes that the value of this exchange will increase as the Company enhances its knowledge processing systems and expands its base of participants. An expanding set of information providers will make the services more compelling for knowledge workers. A larger user base will generate additional readership and revenues for information providers. Increased participation of advertisers, who benefit from a larger user base and a growing number of information topics, will help to reduce subscription costs, leading to further expansion of the Company's user base.

> · · ·

> The Company believes the mutually reinforcing dynamics of its business model are key to sustaining its growth and meeting its strategic objectives.

---

**9.** In the district court, plaintiffs also pointed to the "key employee" section of the registration statement. However, the district court determined that the "bespeaks caution" doctrine negated the materiality of any such omission with respect to that section of the registration statement. Because plaintiffs have not appealed the district court's determination of that issue, we do not now address it.

Plaintiffs argue that this statement is materially misleading because it fails to disclose that, at the time the statement was made, Individual's "business model" was the subject of profound disagreement between Amram and the majority of the Board. Indeed, according to the complaint, Amram's growth through acquisition strategy was directly contrary to the Company's stated "business model" of growing the Company by developing its existing core business. Even accepting these allegations as true—as we must on a motion to dismiss—we conclude that the omission of the conflict between Amram and the Board does not render the "business model" section of the prospectus misleading.[10]

In short, the "business model" section of the prospectus, taken as a whole, is true. According to plaintiffs' complaint, the majority of the Board was committed to growing the Company by building on its existing core business.[11] Disclosure of the business strategy supported by a majority of the directors did not obligate defendants also to disclose information about the extent to which each individual Board member supported that model. *Cf. Backman v. Polaroid,* 910 F.2d 10, 16 (1st Cir.1990) ("[E]ven a voluntary disclosure of information that a reasonable investor would consider material must be 'complete and accu-

rate.' This, however, does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise."). More specifically, disclosure of the business strategy supported by the majority of the Board did not obligate defendants also to disclose the fact that Amram—a distinct minority of a multi-member Board—opposed that strategy. *Cf. id.*[12]

The "use of proceeds" section of Individual's prospectus states that a portion of the net proceeds from the IPO will be used for "general corporate purposes," as well as "the acquisition of businesses, services and technologies that are complementary to those of the Company." Plaintiffs argue that this statement is misleading because it fails to disclose that, at the time the statement was made, Amram and the Board could not agree on what acquisitions were "complementary to those of the Company" nor on the pace at which such acquisitions should be made. We conclude that the omission of Amram's conflict with the majority of the Board did not render the "use of proceeds" section misleading. Like the "business model" section, the "use of proceeds" section of the prospectus is complete and accurate on its face.

First, disclosure of the majority of the Board's intention to use the IPO proceeds

---

**10.** To repeat, the focus of plaintiffs' complaint is that the dispute between Amram and the Board ultimately drove Amram to leave the company. But it does not follow that such a dispute would reasonably lead Amram to conclude that he could never persuade a majority of directors to his view. Under Delaware law, "[t]he vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the directors." Del.Code Ann. tit. 8, § 141(b) (1998). If anything, the Freeloader acquisition, *see supra* note 7, shows that Amram may well have been successful temporarily in persuading directors to his view.

**11.** Plaintiffs' reply brief alludes to an alternative theory of liability: that the Board improperly failed to disclose the fact that negotiations for the acquisition of non-complementary businesses were taking place at

the time of the IPO. However, this alternative theory was not fairly presented to the district court or to this court and is thus waived. *See Sammartano v. Palmas Del Mar Properties, Inc.,* 161 F.3d 96, 97 (1st Cir.1998) (finding theory not squarely raised before the district court to be waived); *United States v. Torres,* 162 F.3d 6, 11 (1st Cir.1998) (noting that issues raised for the first time in an appellant's reply brief are generally deemed waived).

**12.** The complaint makes clear that Amram was "isolated" in his views regarding the strategic direction the Company should take. Compl. ¶ 48 (describing the "then-existing serious and fundamental differences between Amram and the majority of the Board, which made it highly unlikely that Amram could continue to work with the Board given that he was apparently isolated in his views").

for complementary acquisitions did not obligate defendants also to disclose Amram's different views concerning the types of acquisitions Individual should pursue. *Cf. Backman*, 910 F.2d at 16. Second, the Company's adherence to the purpose stated in the "use of proceeds" section rendered that section accurate. Indeed, the complaint alleges that Amram resigned due to the Board's summary rejection of his proposal that the Company contribute 100,000 shares of Individual stock to Free Spirits Holdings, a non-complementary business combination that Amram planned to establish.

In sum, both the "business model" section and the "use of proceeds" section were complete and accurate. Because the omission of the Board-level conflict did not render either section misleading, we agree with the district court that § 11 did not impose on defendants a duty of disclosure.

### 6. Section 15

■ Section 15 of the 1933 Act establishes joint and several liability for "controlling persons"—that is, those who exercise control over primary violators of § 11. 15 U.S.C. § 77o. A necessary element of a § 15 claim is a primary violation of § 11. *See, e.g., SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996). Because plaintiffs have failed to state a claim for such a primary violation, they have also failed to state a claim under § 15. *See Berliner v. Lotus Dev. Corp.*, 783 F.Supp. 708, 712–13 (D.Mass.1992).

### III. CONCLUSION

For the reasons stated above, we **affirm** the district court's dismissal of plaintiffs' complaint for failure to state a claim.