CASTLEROCK MANAGEMENT, LTD., Charles Burns, Stanley Ostern, Shamsuddin Sajan and Babak Honaryar on behalf of themselves and all others similarly situated, Plaintiffs,

v.

ULTRALIFE BATTERIES, INC., Bruce Jagid, Martin G. Rosansky, Joseph N. Barella, Frederick F. Drulard, Joseph C. Abeles, Arthur M. Lieberman, Richard A. Hansen, Carl H. Rosner, Lehman Brothers, A.G. Edwards & Sons, Inc., Pennsylvania Group, Ltd., Defendants.

No. CIV.A. 98–3619 MTB.

United States District Court,
D. New Jersey.

Sept. 28, 1999.

Allyn Z. Lite, Joseph J. DePalma, Goldstein Lite & DePalma, Newark, NJ, Herbert E. Milstein, Daniel S. Sommers, Mark S. Willis, Cohen Milstein Hausfeld & Toll, Washington, DC, Steven J. Toll, Cohen Milstein Hausfeld & Toll, Seattle, WA, for Plaintiffs.

Howard D. Cohen, Stern & Greenberg, Roseland, NJ, Edward S. Feig, Susan Sawyer, Baer Marks & Upham, New York City, for Defendants Ultralife Batteries, Inc., Bruce Jagid, Martin G. Rosansky, Joseph N. Barella, Frederick F. Drulard, Joseph C. Abeles, Arthur M. Lieberman, Richard A. Hansen, and Carl H. Rosen.

Jeffrey J. Greenbaum, Sills Cummis Radin Tischman Epstein & Gross, Newark, NJ, Michael J. Chepiga, Simpson Thacher & Barlett, New York City, for Defendants

Lehman Brothers Inc., A.G. Edwards & Sons, Inc., and Pennsylvania Merchant Group, Ltd.

## *OPINION*

BARRY, District Judge.

This matter comes before the court on a motion to dismiss plaintiffs' two count amended complaint filed by Ultralife Batteries, Inc. ("ULBI"), Bruce Jagid, Martin G. Rosansky, Joseph N. Barella, Frederick F. Drulard, Joseph C. Abeles, Arthur M. Lieberman, Richard A. Hansen, Carl H. Rosner (collectively as "the Individual Defendants"),[1] Lehman Brothers, A.G. Edwards & Sons, Inc., Pennsylvania Group, Ltd. (collectively as "the Underwriter Defendants") pursuant to Fed.R.Civ.P. 12(b)(6) and Fed.R.Civ.P. 9(b). For the reasons which follow, the motion will be granted as to all defendants.[2]

## I.  *Statement of Facts*

The factual underpinnings of this case are not in dispute. Before turning to the specific facts relevant here, however, some background information is necessary. ULBI "develops, manufactures and markets primary and rechargeable lithium batteries". Am. Compl. ¶ 8. ULBI's lithium batteries allegedly "are ultra-thin, lightweight and [ ] generally achieve longer operating time than competing batteries". *Id.* The advanced rechargeable batteries are "integrated into consumer electronic applications such as portable computers and cellular telephones" while the primary batteries, specifically the 9–volt battery at issue here, are "marketed to the consumer retail, security and safety equipment, medical device and specially [sic] instrument market, and [are] currently used in devices such as smoke detectors, home security devices and medical infusion pumps." *Id.*

On February 27, 1998, ULBI filed a Registration Statement with the Securities and Exchange Commission ("SEC"), offering to sell 2,500,000 shares of its common stock at $12.50 per share and intending to use the proceeds of the sale to "increase production capacity of its advanced rechargeable batteries." Am. Compl. ¶ 39. The Registration Statement was amended on April 3, 1998 and April 30, 1998 and incorporated a Prospectus that became effective May 4, 1998 (Registration Statements, amendments and Prospectus collectively as "the Offering documents"). *See id.* The Offering was a "firm commitment underwriting agreement" by several firms, including the Underwriter Defendants who represented the group of underwriters. *See* Feig Decl., Exh A.

Although the Offering documents primarily address the advanced rechargeable batteries, reference to the 9–volt lithium battery is made as well:

The Company's primary battery products are based on its proprietary lithium-manganese dioxide technology. The materials used in, and the chemical reactions inherent to, the Company's lithium batteries provide significant advantages over currently available primary battery technologies, including lighter weight, longer operating time, longer shelf life, and a wider operating temperature range. The Company's primary batteries also have relatively flat voltage profiles which provide stable power. Conventional primary batteries, such as alkaline batteries, have sloping voltage profiles, which result in decreased power during discharge. While the price for the Company's lithium batteries is

1.  The Individual Defendants either are—or were—officers or directors of ULBI and allegedly "signed the Registration Statement." Am. Compl. ¶¶ 9–16

2.  ULBI and the Individual Defendants filed a motion to dismiss ("Def.Br.Supp.") and so did the Underwriter Defendants ("Und.Def.Br.Supp."). As both motions stated that they were incorporating the other's arguments (*see* Def. Br. Supp. at 6 n. 3; Und. Def. Br. Supp. at 2–3), the court may, at times, refer to ULBI, the Individual Defendants, and the Underwriter Defendants collectively as "defendants".

generally higher than commercially available alkaline batteries, the Company believes that the increased energy per unit of weight and volume of its batteries allows longer operating time and less frequent battery replacements for the Company's targeted applications. Therefore, the Company believes that its primary batteries are price competitive with other battery technologies on a price per watt hour basis.

Am. Compl. ¶ 40. The Offering documents, furthermore, state that ULBI anticipates that "profit margins from sales of 9–volt batteries will increase as production volumes increase" (*id.* ¶ 41) and declare that "the decrease in inventories during the six months ended December 31, 1997 is the result of continued improvement in the turnover of 9–volt battery inventories and the completion of the Company's contract to produce BA–5372 batteries for the U.S. Army." *Id.* ¶ 42.

Also mentioned in the Offering documents is the recently enacted Oregon law, and its impact upon the 9–volt battery market:

> The Company expects that its 9–volt lithium battery market has expanded as a result of a state law recently enacted in Oregon. The Oregon statute requires that, as of January 1, 1998, all battery-operated smoke detectors sold in that state must include a 10–year battery. Similar legislation has been recently proposed in New York State that would also require all smoke alarms operated solely by a battery to include a battery warranted to last 10–years. The Company manufactures the only standard size 9–volt battery warranted to last 10–years.

*Id.* ¶ 43 With respect to the production facility for the 9–volt lithium battery, the Offering documents state:

> The Company believes that its 9–volt lithium battery production facility based in Newark, New York, is one of the most automated and efficient lithium battery production facilities of its kind currently

operating. The Company's production facility currently has the capacity to produce 9–million 9–volt lithium batteries per year with its existing equipment. *Id.* ¶ 44.

The Offering was consummated on May 4, 1998. On May 12, 1998, ULBI announced the results "for the third quarter and first nine months of fiscal year 1998 for the period ended March 31, 1998" (the "Release") which "continued to tout its growth in the 9–volt lithium battery business". *Id.* ¶ 47. Noting a decline in sales, ULBI attributed the losses to a manufacturing plant fire in the United Kingdom. *See id.* The Release went on to note that "[p]artially offsetting the shortfall for the UK operations were a gain in 9–volt lithium battery sales, up 58% during the quarter over the last year, and higher technology contract revenues from programs that advanced both primary and rechargeable battery technology." *Id.* The Release further stated that:

> The demand for our 9–volt lithium battery from both OEM and retail customers has increased dramatically and with our current level of booked orders we expect to achieve record sales of this product in the current fiscal year.

*Id.* ¶ 48.

On June 10, 1998, an analyst at A.G. Edwards downgraded the ULBI stock from "buy" to "accumulate". *Id.* ¶ 49. Subsequent to the downgrade, the common stock fell $2.00 per share, to close at $10.00 per share. *See id.* Late in the afternoon of the next day, June 11, ULBI made the following announcement:

> While demand for the Company's 9–volt lithium battery is at an all time high, and the product will achieve record sales in this fiscal year, manufacturing has not been able to ramp up to planned production rates as quickly as anticipated. As a result, the Company has incurred higher than anticipated production costs and fallen short of anticipated revenues for the quarter. However, the neces-

sary corrective actions have been taken to accelerate production to the required levels and improve efficiencies. *Id.* ¶ 50. Following the announcement, the stock closed at $9.75 per share. *Id.* ¶ 51. On June 12, 1998, the day after the announcement, the stock fell to $8.1875 per share, losing "19.08% of its value in one day". *Id.* ¶¶ 3, 52. As plaintiffs had "purchased shares of ULBI common stock pursuant to the Offering and during the Class Period," they suffered losses. *Id.* ¶ 7.

After filing an initial complaint on August 3, 1998, plaintiffs filed an amended complaint on January 5, 1999 alleging that ULBI, the Individual Defendants and the Underwriter Defendants made false and material misleading statements in or omissions from the Offering documents in violation of Sections 11 and 12(2) of the Securities Act, 15 U.S.C. §§ 77k, 77l(2) (1933), and further sought to hold the Individual Defendants [3] liable as "control persons" under Section 15 of the Securities Act, 15 U.S.C. § 77o (1933)("the Securities Act"). Defendants now move for dismissal of the complaint for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), and for failure to plead fraud with particularity, pursuant to Fed.R.Civ.P. 9(b).

## II. *Discussion*

A motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) will be granted if the court finds "beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,*

355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). All well-pleaded allegations in the complaint must be accepted as true and all reasonable inferences must be drawn in favor of the non-moving party. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir. 1991). Moreover, while a court usually looks only to the facts alleged in the complaint on a motion to dismiss, documents referred to in the complaint, such as the Offering documents here, may be referred to if they form the basis for plaintiff's claims. *See In re Donald Trump Casino Securities Lit.,* 7 F.3d 357, 368 n. 9 (3d Cir.1993), *cert. denied sub nom.,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *In re MobileMedia Securities Lit.,* 28 F.Supp.2d 901, 922 (D.N.J.1998).

In their own words, plaintiffs allege that "defendants, in connection with a public offering of ULBI common stock ... made a series of false and misleading statements relating to ULBI's 9–volt lithium battery and, in particular, *the ability of ULBI to manufacture such batteries in sufficient quantities and in a sufficiently timely fashion to satisfy demand.*" Am. Compl. ¶ 2 (emphasis added). Defendants argue that plaintiffs fail to state a claim upon which relief can be granted under either § 11 or 12 of the Securities Act and that plaintiffs fail to allege fraud with sufficient particularity.

■ To state a claim for a violation of § 11,[4] it must be alleged that:

---

3. Plaintiffs are not seeking to hold the Underwriter Defendants liable for a violation of § 15 of the Securities Act. *See* Pl. Opp. Br. at 31 n. 19.

4. § 11 states:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he [or she] knew of such un-

truth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue ... every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him [or her], who has with his [or her] consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him [or her].

plaintiffs purchased securities traceable to an effective registration statement; the defendants fall within the statutorily enumerated categories;[5] and the registration statement, at the time it became effective, contained a material misstatement or omission.

*In re MobileMedia,* 28 F.Supp.2d at 923 (citing *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *In re Trump,* 7 F.3d at 365 n. 2, 368 n. 10). "A section 11 claim can be asserted against every person who signed the prospectus, the issuer's officers and board of directors, the underwriters of the securities offering[ ]". *Rhodes v. Omega Research, Inc.,* 38 F.Supp.2d 1353, 1359 (S.D.Fla.1999). Finally, the restrictions of § 11 "concern[ ] only registration statements" and, thus,

5. The following are subject to liability pursuant to § 11:
    (1) every person who signed the registration statement;
    (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
    (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;
    (4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; [and]
    (5) every underwriter with respect to such security.
    15 U.S.C. § 77k(a)(1–5).

6. While plaintiffs have set forth numerous statements made by defendants regarding the demand for the 9–volt lithium battery *prior* to the Offering (*see* Am. Compl. ¶¶ 33–39), their claims are based upon false and misleading statements made during the "Class Period"

"any additional statements, including 'roadshow' presentations, analysts' reports or statements to institutional investors (i.e. conference calls) are generally outside the reach of section 11." *Id.* at 1360 n. 8 (citing *In re Stac Electronics Securities Lit.,* 89 F.3d 1399, 1405 (9th Cir.1996), *cert. denied sub nom.,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997)).[6] Under § 12(2) [7] any defendant who:

'offers or sells a security ... by means of a prospectus or oral communication' containing a materially false statement or 'omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading,' shall be liable to any 'person purchasing such security from him.'

which, by their own definition, ran from April 30, 1998 to June 12, 1998. Am. Compl. ¶ 1. Accordingly, only those statements made during the class period are being considered by the court.

7. § 12(2) states:
    Any person who—
        (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
    shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
    15 U.S.C. § 77l.

*Rhodes,* 38 F.Supp.2d at 1359 (quoting 15 U.S.C. § 77*l*(a)(2)); *see also In re MobileMedia,* 28 F.Supp.2d at 924 (citing *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 687–88 (3d Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991)).

▮ Neither a § 11 nor a § 12(2) claim requires that a plaintiff plead fraud or scienter, for the claims may sound in negligence. *See In re Cendant Corp. Lit.,* 60 F.Supp.2d 354, 364 (D.N.J.1999). Should a plaintiff's claim sound in fraud, however, compliance with the pleading requirements of Fed.R.Civ.P. 9(b) is required. *See Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 288 (3d Cir.)("[w]e hold that when § 11 and § 12(2) claims are grounded in fraud rather than negligence, Rule 9(b) applies"), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *see also Cooperman v. Individual Inc.,* 171 F.3d 43, 47 n. 6 (1st Cir.1999); *In re Stac,* 89 F.3d at 1404–05; *Schoenhaut v. American Sensors, Inc.,* 986 F.Supp. 785, 795 (S.D.N.Y.1997)(noting that "if plaintiffs have plead fraud, they must comply with the requirements of Rule 9(b)").

Rule 9(b) requires that a plaintiff plead:

(1) a specific false representation of material fact;

(2) knowledge by the person who made it of its falsity;

(3) ignorance of its falsity by the person to whom it was made;

(4) the intention that it should be acted upon; and

(5) that the plaintiff acted upon it to his [or her] damage.

*Shapiro,* 964 F.2d at 284 (citation omitted). Because in the securities context the "factual information is peculiarly within the defendant's knowledge or control," the Third Circuit has stated that "the normally rigorous particularity rule has been relaxed somewhat ... But even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *In re Burlington Coat Factory Securities Lit.,* 114 F.3d 1410, 1418 (3d Cir.1997)(citing *Shapiro,* 964 F.2d at 284–85).[8]

---

8. The Ninth Circuit put a fine point on the difficulty in a securities fraud case:

At argument, counsel for plaintiffs hypothesized that a plaintiff might allege that he bought a house from defendant, that defendant assured him that it was in perfect shape, and that in fact the house turned out to be built on landfill, or in a highly irradiated area; plaintiff could simply set forth these facts (presumably along with time and place), allege scienter in conclusory fashion, and be in compliance with Rule 9(b). We agree that such a pleading would satisfy the rule. Since "in perfect shape" and "built on landfill" are at least arguably inconsistent, plaintiff would have set forth the most central "circumstance constituting fraud"—namely, that what defendant said was false. Notably, the statement would have been just as false when defendant uttered it as when plaintiff discovered the truth. The house was always defective because it was always built on landfill. What makes many securities fraud cases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false. Securities fraud cases often involve some more or less catastrophic event occurring between the time the complained-of statement was made and the time a more sobering truth is revealed (precipitating a drop in stock price). Such events might include, for example, a general decline in the stock market, a decline in other markets affecting the company's product, a shift in consumer demand, the appearance of a new competitor, or a major lawsuit. When such an event has occurred, it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood. In the face of such intervening events, a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made. This can be done most directly by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants.

The common thread running through plaintiffs' claims, as it must, is the presence of a material false or misleading statement, or the omission of material information, in connection with an offering of securities. To put it another way, " '[a]t a minimum, each of the securities fraud provisions' allegedly violated by the Defendants 'requires proof that the defendants made untrue or misleading statements or omissions of material fact.' " *Zucker v. Quasha*, 891 F.Supp. 1010, 1014 (D.N.J.1995)(quoting *In Re Trump*, 7 F.3d at 368), *aff'd*, 82 F.3d 408, *cert. denied*, 519 U.S. 825, 117 S.Ct. 85, 136 L.Ed.2d 42 (1996). Unless a materially false or misleading statement, or omission, is pled, therefore, none of plaintiffs' claims may go forward. The court, then, will turn its attention to that thread in resolving defendants' motions to dismiss.

■ Plaintiffs argue that the statements set forth in paragraphs 40–44 of their amended complaint (set forth *supra* at 481–82) indeed constitute material misrepresentations.[9] *See* Pl. Br. Opp. at 17. In their view, the enumerated statements, touting the demand and growth potential for the 9–volt battery market, were false and misleading because on June 11, 1998, forty days after the May 12 Release and forty-eight days after the Prospectus became effective, ULBI disclosed its "ramping up" difficulties with respect to the 9–volt battery. *See id.* at 17–18. Further, plaintiffs argue that defendants not only had a duty to know or should have known of the ramping up problems (*see id.* at 18), but, in fact, "were obviously acutely aware of the state of ULBI's manufacturing facilities" based on statements made about the

facilities at an earlier date and because "a problem of this magnitude impacting such an important product would not sneak up on ULBI overnight" Pl. Opp. Br. at 19. Thus, plaintiffs allege *both* material misstatements and omissions. *See, e.g., In re Stac*, 89 F.3d at 1408 (noting that plaintiff had alleged "both material omissions and misstatements" by alleging that defendant "failed to disclose its inadequate reserves for returns" and affirmatively misstated in its Prospectus that "it provides adequate allowances for returns"). Defendants argue that not only have plaintiffs failed to allege the falsity of any statement made in the Offering documents, they have also failed to offer any facts to support their conclusion that ULBI must have known about the production problems at an earlier date and, therefore, omitted material information. This court agrees with defendants.

At the outset, the court notes that despite their arguments to the contrary, (*see* Pl. Opp. Br. at 14), plaintiffs' claims against defendants sound in fraud and thus are subject to the demands of Rule 9(b). The amended complaint is replete with allegations of intentional or reckless, rather than negligent, conduct on the part of defendants. *See e.g.* Am. Compl. ¶ 20 ("ULBI and the Individual Defendants participated in the alleged wrongdoing, in part, in order to continue and prolong the illusion of ULBI's financial growth, to inflate ULBI's publicly reported revenues and earnings, to conceal the adverse facts concerning ULBI's operations, financial condition and business and to permit ULBI to raise millions of dollars pursuant to the Offering"); *id.* at 53 ("[T]he Underwriter Defendants participated in the

---

*In re GlenFed, Inc. Securities Lit.*, 42 F.3d 1541, 1548–49 (9th Cir.1994)(footnotes omitted).

9. Defendants argue, among other things, that the "Bespeaks Caution" doctrine and the statutory "Safe Harbor" provision shield them from liability for these statements. *See* Def. Br. Supp. at 22–30. Given the disposition herein, the court need not and will not reach this argument, but were it to do so it would be

inclined to agree with plaintiffs that their claims are based upon "omissions of existing facts and circumstances" at the time the statements were made, and do not constitute the forward-looking statements required by the aforementioned doctrines. *MobileMedia*, 28 F.Supp.2d at 930; *see also In re Number Nine Visual Technology Corp. Securities Lit.*, 51 F.Supp.2d 1, 19 (D.Mass.1999).

scheme to inflate ULBI's· stock price through the dissemination of material misrepresentations[ ]"). While plaintiffs correctly point out that they are the masters of their complaint (*see* Pl. Opp. Br. at 14), the court is not required to put on a blindfold when ruling on a motion to dismiss. Even construing the allegations of the amended complaint in the light most favorable to plaintiffs and accepting their contention that the word "fraud" is not mentioned therein, their §§ 11 and 12(2) claims drip with allegations of intentional misconduct. *See In re Stac*, 89 F.3d at 1404 n. 2 (noting that plaintiff's argument that ·it "specifically disclaimed any allegations of fraud with respect to its Section 11 claims" was "unconvincing where the gravamen of the complaint is plainly fraud"); *see also Shapiro*, 964 F.2d at 287–88 (holding that based on allegations of knowing and reckless behavior, "[t]he only reasonable conclusion that can be drawn is that plaintiffs charge defendants with fraud. There is not a hint in the allegations that defendants were negligent in violating §§ 11 and 12(2).").[10]

Next, it is clear that plaintiffs do not allege that any of the aforementioned statements, or alleged misrepresentations, were actually false. Plaintiffs do not argue, for example, that ULBI's profit margins did not increase (*see* Am. Compl. ¶ 41) or that there was not increased demand for the 9–volt battery. *See id.* ¶ 48. Neither do plaintiffs dispute that ULBI is the

only maker of 9–volt lithium batteries (*see id.* ¶ 43) or that the sales of the 9–volt battery increased.[11] *See id.* ¶ 47. Instead, plaintiffs argue that defendants failed to disclose at an earlier date the production problems they announced in ·June. *See* Pl. Opp. Br. at 19–20. In other words,

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a· favorable light.· Later the firm discloses that things are less rosy. The plaintiff contends that · the difference must be attributable to fraud.

*Urbach v. Sayles*, 779 F.Supp. 351, 359 (D.N.J.1991)(quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627–28 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)).

·To satisfy the "must be," plaintiffs must plead "non-conclusory facts that, if true, would demonstrate that the projections were false when made" and "facts 'from which an inference of fraud by a given defendant may be drawn.'" *Urbach*, 779 F.Supp. at 359 (citing *In re Union Carbide Corp. Consumer Products Business Securities Lit.*, 666 F.Supp. 547, 557 (S.D.N.Y. 1987)). Here, to survive the motions to dismiss, plaintiffs must allege specific facts—as opposed to conclusory allegations—supporting their contention that ULBI was aware of its production problems with the 9–volt battery *at the time* of the challenged statements in or omissions from the Offering documents.[12] *See Zuck-*

10. The court will shortly proceed with its analysis pursuant to Rule 12(b)(6) with an eye towards the requirements of Rule 9(b). *See Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990)("The general rule that pleadings are to be construed in the light most favorable to the pleader and accepted as true, and not be dismissed, unless it appears that plaintiff can prove no set of facts that would entitle him to relief, is not thereby abrogated [by the application of Rule 9(b) ]. When fraud is asserted, the general rule is simply applied in light of Rule 9(b)'s particularity requirements.") (citations omitted).

11. Plaintiffs make much of the fact that ULBI claimed that its ·"state of the art" facility could handle the production of 9 million 9–

volt lithium batteries per year, and yet failed to handle the production. Am. Compl. ¶ 44. Oddly, however, they do *not* allege that the demand ULBI could not "ramp up" to satisfy was, in fact, less than 9 million. Furthermore, although plaintiffs claim that "there was no reasonable basis to believe that [ULBI] could 'ramp up' its 9–volt lithium battery manufacturing facility quickly enough to satisfy demand" (*id.* ¶ 52(b)), defendants, in fact, never made a statement averring that they *could* "ramp up" to meet the heightened demand. *See* Def. Br. Supp. at 17 n. 11.

12. Plaintiffs state that "[e]xcept as alleged in this Complaint, the underlying information relating to defendants' misconduct and the particulars thereof are not available to plain-

*er,* 891 F.Supp. at 1014. What plaintiffs *cannot* do is rely on a theory of "fraud by hindsight," a theory soundly rejected by several courts. *See, e.g., Gross v. Summa Four, Inc.,* 93 F.3d 987, 991 (1st Cir. 1996)("We have consistently held that a securities plaintiff does not satisfy the requirements of Rule 9(b) merely by pleading 'fraud by hindsight' ")(§ 10b–5 case); [13] *Schoenhaut,* 986 F.Supp. at 790 (same); *Zucker,* 891 F.Supp. at 1014 (" '[F]raud by hindsight,' the attempt to impose liability on management for unrealized economic predictions, is not actionable."). Instead, plaintiffs must show that defendants misrepresented or omitted *existing* material information which gave rise to a false and misleading impression:

> As an outgrowth of the requirement that a statement must be materially misleading at the time it was made for liability to attach, courts have held that: omissions that create a misleading impression—particularly one that is misleading *only in hindsight*—are not sufficient to constitute the basis of a securities action under section 11 or section 12(2).

*Zucker,* 891 F.Supp. at 1017 (quoting *In re Bank of Boston Securities Lit.,* 762 F.Supp. 1525, 1538 (D.Mass.1991)(italics in original)).

To that end, plaintiffs point to the brief period of time in between the Offering documents and the May 12 Release and the June 11 disclosure of production problems.[14] *See* Pl. Br. Opp. at 17–18. They suggest, thereby, that the production problems "couldn't have happened overnight." *See id.* at 19. Unfortunately for plaintiffs, that theory alone, without even allegations of facts contemporaneous to the issuance of the Offering documents supporting the theory, is simply not enough to withstand a motion to dismiss. Stated somewhat differently, alleging in a wholly conclusory fashion that an inference of defendants' knowledge can be drawn based on the mere lapse of time between the release of the Offering documents and the disclosure of the production problems announced on June 11, 1998, with nothing contemporaneous to support that conclusion,[15] is insufficient. *See In re Number Nine,* 51 F.Supp.2d at 17 (holding that plaintiffs had "insufficiently alleged material misstatements based solely on the subsequent announcement of inventory markdowns by [defendant]" eight months after the initial public offering); *DiLeo,* 901 F.2d at 627; *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25–26 (1st Cir.1992)(holding that without detailed factual allegations, the mere existence of an undisclosed lawsuit does not indicate fraudulent conduct by defendant); *Gross,* 93 F.3d at 995 (holding that statements made at June 14 board meeting regarding delayed orders did not support inference that defendant was aware of delay at the time of May 3 press release);

---

tiffs and the public and lie exclusively within the possession and control of defendants and other insiders of the defendant corporation." That boilerplate language alone, however, is insufficient. *See Weiner v. Quaker Oats Co.,* 129 F.3d 310, 319 (3d Cir.1997)(" '[t]o avoid dismissal in these circumstances, a complaint must delineate at least the nature and scope of plaintiffs' effort to obtain, before filing the complaint, the information needed to plead with particularity.' ") (quoting *Shapiro,* 964 F.2d at 285).

**13.** While many of the cases cited herein deal with violations of § 10(b) of the Securities Act, the § 10(b)analysis can inform a § 11 analysis when the § 11 claim sounds in fraud. *See In re Number Nine,* 51 F.Supp.2d at 17 n. 14.

**14.** In paragraph 52(c) of the amended complaint, plaintiffs state that ULBI "was incurring increased production costs and delays resulting from, among other things, the need to train new production line workers and increased equipment maintenance expenses[ ]". Factual support for these statements, however, is not provided.

**15.** Defendants correctly point out that plaintiffs' reliance on *In re Children's Place Sec. Lit.,* No. 97–5021 (D.N.J. Sept.4 1998)and *In re MobileMedia,* 28 F.Supp.2d 901 (D.N.J. 1998) is misplaced given that in those cases the claims survived the motions to dismiss *because of* additional factual support that bolstered the inference plaintiffs wished the court to draw. *See* Def. Reply Br. at 6–8.

*but see Cooperman,* 171 F.3d at 48 (holding that departure of President and CEO of defendant company four and one-half months after the IPO could support inference that a "Board-level conflict" existed at the time of the offering). Plaintiffs' amended complaint, therefore, must be dismissed for failure to allege fraud with particularity.[16] As they have requested (*see* Pl. Opp. Br. at 33 n. 21), plaintiffs are granted leave to again amend their complaint to remedy, if they can, this otherwise fatal deficiency.

### III. *Conclusion*

For the foregoing reasons, defendants' motions will be granted and the amended complaint will be dismissed without prejudice. An appropriate order will issue.

### *ORDER*

This matter having come before the court on a motion to dismiss plaintiffs' complaint filed by Ultralife Batteries, Inc. ("ULBI"), Bruce Jagid, Martin G. Rosansky, Joseph N. Barella, Frederick F. Drulard, Joseph C. Abeles, Arthur M. Lieberman, Richard A. Hansen, Carl H. Rosner (collectively as "the Individual Defendants"), Lehman Brothers, A.G. Edwards & Sons, Inc., Pennsylvania Group, Ltd. (collectively as "the Underwriter Defendants"); and the court having considered the parties' submissions without oral argument pursuant to Fed.R.Civ.P. 78; and consistent with this court's opinion of even date;

IT IS on this 28th day of September, 1999,

ORDERED that plaintiffs' amended complaint be and hereby is dismissed without prejudice; and it is further

ORDERED that plaintiffs are granted leave to amend their amended complaint within thirty days of the date of this order.

---

16. Plaintiffs also claim that the Individual Defendants are liable for violating § 15 of the Securities Act. Because, however, a § 15 claim is reliant upon finding a violation of §§ 11 or 12, and the court is dismissing the §§ 11 and 12 claims, the merits of the § 15 claim will not be addressed. *See* 15 U.S.C. § 77o; *Shapiro,* 964 F.2d at 279; *Zucker,* 891 F.Supp. at 1014 (noting that a claim under § 15 against "controlling persons" is "based upon violations of §§ 11 and 12 of the Securities Act of 1933 that are committed by persons under their control").