CASTLEROCK MANAGEMENT LTD., Charles Burns, Stanley Ostern, Shamsuddin Sajan, and Babak Honaryar, on behalf of themselves and all other similarly situated, Plaintiffs,

v.

ULTRALIFE BATTERIES, INC., Bruce Jagid, Martin G. Rosansky, Joseph N. Barella, Frederick F. Drulard, Joseph C. Abeles, Arthur M. Lieberman, Richard A. Hansen, Carl H. Rosner, Lehman Brothers, A.G. Edwards & Sons, Inc., and Pennsylvania Merchant Group, Ltd., Defendants.

No. CIV.98–3619.

United States District Court,
D. New Jersey.

Sept. 28, 2000.

Howard D. Cohen, Stern & Greenberg, Roseland, for Defendant Ultralife Batteries, Inc., Bruce Jagid, Martin G. Rosansky, Joseph N. Barella, Frederick F. Drulard, Joseph C. Abeles, Arthur M. Lieberman, Richard A. Hansen, and Carl H. Rosner.

Edward S. Feig, Susan Sawyer, Baer Marks & Upham, LLP, New York, NY, for Defendant Ultralife Batteries, Inc., Bruce Jagid, Martin G. Rosansky, Joseph N. Barella, Frederick F. Drulard, Joseph C. Abeles, Arthur M. Lieberman, Richard A. Hansen, and Carl H. Rosner.

Jeffrey J. Greenbaum, Sills Cummins Radin Tischman Epstein & Gross, Newark, for Defendants Lehman Brothers, A.G. Edwards & Sons, Inc. and Pennsylvania Merchant Group, Ltd.

Michael J. Chepiga, Simpson Thacher & Bartlett, New York, NY, for Defendants Lehman Brothers, A.G. Edwards & Sons, Inc. and Pennsylvania Merchant Group, Ltd.

Allyn Zissel Lite, Lite, DePalma, Greenberg & Rivas, LLC, Newark, for Plaintiffs Castlerock Management Ltd., Charles Burns, Stanley Ostern, Shamsuddin Sajan, and Babak Honaryar.

Herbert E. Milstein, Daniel S. Sommers, Mark S. Willis, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, D.C., for Plaintiffs Castlerock Management Ltd., Charles Burns, Stanley Ostern, Shamsuddin Sajan, and Babak Honaryar.

## OPINION & ORDER

HOCHBERG, District Judge.

This matter comes before the Court upon motions by Defendants Ultralife Batteries, Inc. (hereinafter "Ultralife" or the "Company"), Individual Defendants Bruce Jagid, Martin G. Rosansky, Joseph N. Barella, Frederick F. Drulard, Joseph C. Abeles, Arthur M. Lieberman, Richard A. Hansen, and Carl H. Rosner (hereinafter the "Individual Defendants"), and Underwriters Lehman Brothers, A.G. Edwards & Sons, Inc. and Pennsylvania Merchant Group, Ltd. (hereinafter "Underwriters" or "Underwriter Defendants"), to dismiss Plaintiffs' Second Amended Complaint in its entirety for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6).[1] Having reviewed the submissions of the parties without oral argument, pursuant to Fed.R.Civ.P. 78, and for the following reasons, this Court will grant Defendants' Motions to Dismiss with prejudice.

## I. BACKGROUND

Ultralife develops, manufactures and markets primary and advanced rechargeable lithium batteries. Since 1991, Ultralife has manufactured a product line of lithium primary batteries, including a 9–volt battery sold to manufacturers of smoke detectors. In March, 1997, Ultralife refocused its business strategy on the marketing of its advanced rechargeable batteries, for which Ultralife possessed its own proprietary technology; these rechargeable batteries were designed to be used in popular consumer electronic applications such as

---

1. There are two motions to dismiss pending before this Court. Ultralife and the Individual Defendants have filed one motion, and the Underwriters have filed a separate motion.

The Court will refer to Ultralife, the Individual Defendants, and the Underwriters collectively as "Defendants," unless otherwise specifically indicated.

cellular telephones and portable computers. Since the Company's inception in 1991, Ultralife's primary battery business has been unprofitable. The Company has relied in large part on funds generated through public offerings of its securities to sustain its business and finance the development of its advanced rechargeable batteries. Ultralife's initial public offering of stock was in December, 1992, with a second offering in December, 1994. In 1998, Ultralife again made a public offering of securities in order to raise the funds necessary to pursue the commercialization of its new advanced rechargeable battery.

The 1998 public offering of securities has spawned this action. Although the primary focus of the securities offering in 1998 was to raise funds for the advanced rechargeable battery, the main thrust of Plaintiffs' Second Amended Complaint is based upon statements made in the public offering documents pertaining to the 9–volt battery products.

In the 1998 Registration Statement and Prospectus (collectively referred to as the "Offering Documents"), Ultralife offered to sell 2.5 million shares of its common stock at $12.50 per share. The Offering was underwritten by a group of ten underwriters, including, *inter alia,* Lehman Brothers, Inc., A.G. Edwards & Sons, Inc. and Pennsylvania Merchant Group, Ltd., the Underwriter Defendants here. The Offering Documents informed the public that the sole purpose of raising equity was to develop and commercialize the advanced rechargeable battery; Ultralife stated that none of the proceeds were earmarked for any other aspect of the Company's business or operation, including its 9–volt primary battery. Ultralife's Offering Documents included five statements about the 9–volt battery that form the basis for Plaintiffs' Second Amended Complaint, which alleges violations of Sections 11, 12(2) and 15 of the Securities Act of 1933. Plaintiffs' First Amended Complaint, alleging fraudulent misstatements, was dismissed by the Honorable Maryanne Trump Barry, upon findings that: (i) none of the statements made in the Offering Documents was untrue when stated; (ii) that Plaintiffs' allegations sounded in fraud; and (iii) that Plaintiffs had not sufficiently pleaded fraud with the particularity required by Fed.R.Civ.P. 9(b). (*See* discussion *infra*). Plaintiffs were given leave to file a Second Amended Complaint to cure the First Amended Complaint's deficiencies, specifically to attempt again to plead fraud with particularity.

Rather than pleading fraud with particularity as instructed, however, Plaintiffs chose to file the Second Amended Complaint upon a theory of negligent misrepresentation or omission. The five statements in the Offering Documents alleged to be negligent misrepresentations all relate to the 9–volt battery division. The alleged misstatements are as follows:

"While the price for the Company's lithium batteries is generally higher than commercially available alkaline batteries, the Company believes that the increased energy per unit of weight and volume of its batteries allows longer operating time and less frequent battery replacement for the Company's targeted applications. Therefore, the Company believes that its primary batteries are price competitive with other battery technologies on a price per watt hour basis." (Sec.Am.Cmplt.¶ 37)

The Company "anticipates that profit margins from sales of rechargeable batteries will increase as production is automated and that profit margins from sales of 9–volt batteries will increase as production volumes increase." (Sec.Am. Cmplt.¶ 38).

"The decrease in inventories in the last six months ended December 31, 1997 is the result of continued improvement in the turnover of 9–volt battery inventories and the completion of the Company's contract to produce BA–5372 batteries for the U.S. Army." (Sec.Am. Cmplt.¶ 39).

"The Company expects that its 9–volt battery market has expanded as a result of a state law recently enacted in Ore-

gon. The Oregon statute requires that, as of January 1, 1998, all battery-operated smoke detectors sold in that state must include a 10–year battery. Similar legislation has been recently proposed in New York State that would also require all smoke alarms operated solely by a battery to include a battery warranted to last 10–years. The Company manufactures the only standard size 9–volt battery warranted to last 10–years." (Sec.Am.Cmplt.¶ 40).

"The Company believes that its 9–volt battery production facility based in Newark, New York, is one of the most automated and efficient lithium battery production facilities of its kind currently operating. The Company's production facility currently has the capacity to product 9–million 9–volt lithium batteries per year with its existing equipment." (Sec.Am.Cmplt.¶ 41).

The Offering Documents also contained cautions to investors about the substantial risks inherent in investing in Ultralife's research and development efforts. The Company warned that purchases of its shares "involved a high degree of risk," and included eight pages of detailed risk factors and cautions outlining the risks poised by Ultralife's plan for future success:

"The Company commenced operations in March 1991 and has incurred net operating losses since its inception. Losses have resulted principally from research and development, manufacturing and general and administrative costs. *No assurance can be given that the Company will generated an operating profit or achieve profitability in the future.*"

\*　　\*　　\*　　\*　　\*　　\*

"*Rapid growth of the Company's advanced rechargeable battery business or other segments of its business may significantly strain the Company's management, operations and technical resources ... There can be no assurance, however, that the Company's business will achieve rapid growth or that its efforts to expand its manufacturing and*

*quality control activities will be successful or that it will be able to satisfy commercial scale production requirements on a timely and cost effective basis ....* Failure by the Company to management its grow effectively could have an adverse effect on the Company's business, financial condition and results of operations."

(*See* December 22, 1999 Affidavit of Edward S. Feig, Ex. A [the Prospectus] at 8–10 (hereinafter "Feig Aff't."); Sec. Am. Cmplt. ¶ 43.)

The Offering Documents also disclosed the fact that the Company had, the prior year, lowered production levels of its 9–volt battery in order to sell batteries from its inventory of previously produced batteries. Thus, the 9–volt battery production rate was operating below its normal level, which would add further strain on operations as business expanded. (*See Feig Aff't*, Ex. A at 26.)

On May 12, 1998, just after completion of the public offering of the securities, the Company announced that "[t]he demand for our 9–volt lithium battery from both OEM and retail customers has increased dramatically...." (Sec.Am.Cmplt.¶ 45.) A second press release one month later on June 11, 1998, confirmed that the record demand for its 9–volt battery was, in fact, producing a strain on the Company's production process. The press release stated:

"While demand for the Company's 9–volt lithium battery is at an all time high, and the product will achieve record sales in this fiscal year, manufacturing has not been able to ramp up to planned production rates as quickly as anticipated. As a result, the Company has incurred higher than anticipated productions costs and fallen short of anticipated revenues for the quarter. However, the necessary corrective actions have been taken to accelerate production to the required levels and improve efficiencies." (Sec.Am. Cmplt.¶ 47.)

One day prior to this press release, a key analyst had downgraded the stock of Ultralife from "buy" to "accumulate," based upon issues involving both the Company's 9–volt and rechargeable battery production lines. On June 10, 1998, in response to the analyst's down grading of the stock from "buy" to "accumulate," the stock price fell $2.00 per share; the Company's press release the next day resulted in an additional .25¢ decline, and a further decline of a $1.80 the following day.

## II. *PROCEDURAL HISTORY OF THE CASE*

Plaintiffs filed their Complaint on August 3, 1998. Their First Amended Complaint was filed January 5, 1999. In response to Defendants' Motions to Dismiss, by Opinion and Order dated September 28, 1999 the Court dismissed the First Amended Complaint for failure to state a claim and failure to plead fraud with particularly. *Castlerock Management Ltd. v. Ultralife Batteries, Inc.*, 68 F.Supp.2d 480 (D.N.J.1999). The Court noted that the crux of Plaintiffs' Amended Complaint was that "[D]efendants failed to disclose at an earlier date the production problems they announced in June," *Castlerock,* 68 F.Supp.2d at 487, and found that Plaintiffs had failed to allege the requisite factual support for their conclusion that the Company knew of these productions problems at the time of the public offering. Thus, the Court found that the Plaintiffs had failed to dispute the truth of any of the challenge statements in the Offering Documents. *Id.* Plaintiffs were granted leave to "again amend their complaint to remedy, if they can, this otherwise fatal deficiency." *Id.* at 489.

Plaintiffs filed a Second Amended Complaint on November 9, 1999, again seeking to hold the Defendants liable for violating Sections 11 and 12(2) of the Securities Act and again claiming that the Individual De-

fendants are liable as "control persons" under Section 15 of the Securities Act. The claims are based, as before, on the above five statements in the Offering Documents concerning the 9–volt battery.[2] The Second Amended Complaint reiterates much of Plaintiffs' prior attempt to support their allegations that the Offering Documents contained statements that were untrue or misleading at the time the Offering Documents were issued. Both the First and Second Amended Complaints alleged that the 9–volt lithium battery manufacturing facility was inadequate to satisfy the demand for its product; that the Company had omitted to state that it could not "ramp-up" quickly enough to satisfy the expected increasing demand for the 9–volt in response to the favorable state legislation; and that the Company was incurring increased production costs and delays resulting from the need to train new production line workers and increased equipment maintenance expenses, which factors were suppressing anticipated revenues.

Thus, despite having been granted leave to file a Second Amended Complaint to plead fraud with particularity by demonstrating contemporaneous facts to show that the statements were false or misleading when made, a comparison of the Second Amended Complaint with the dismissed First Amended Complaint reveals very little that is newly alleged. The differences are: (1) Plaintiffs have removed all allegations of fraud and have expressly disavowed any allegations of intentional, knowing or reckless conduct by Defendants; and (2) Plaintiffs now allege that an anonymous former Ultralife employee informed them that the Ultralife production facility was "inadequate to satisfy the demand for its 9–volt lithium battery," because Ultralife "had no real plans to actually ramp production on the 9–volt lithium battery and .... was not capable of ramp-

**2.** While the Second Amended Complaint, like its predecessors, also sets forth numerous other statements prior to the public offering, they are not properly before the Court as a specific basis for Plaintiffs' claim of misrepresenta-

tion, since Plaintiffs' claims are based upon statements made during the "class period" commencing April 30, 1998 and concluding June 12, 1998. *See Castlerock,* 68 F.Supp.2d at 484 n. 6.

ing up production on the 9–volt lithium battery from 4 million to 9 million because the equipment used ... to manufacture the battery ... suffered from extensive maintenance problems." (Sec.Am. Cmplt.¶ 49a.)

The gravamen of Plaintiffs' Second Amended Complaint is that, when Defendants' Prospectus described the factory's capacity to produce 9 million 9–volt batteries, it negligently failed to state that Ultralife would experience a strain upon its manufacturing processes by a rapid increase of demand that would require production to be increased to maximum capacity. In other words, Plaintiffs do not allege that Defendants' expressed statement that its manufacturing facility had the capacity to produce 9 million 9–volt batteries is false, nor that any other expressed statement is false. Instead, Plaintiffs allege that Ultralife negligently omitted to state that when the anticipated increase in demand actually materialized, the Company would be unable to utilize full capacity in a cost-effect and smooth manner, but rather would experience the strain of ramping-up production to meet demand. The Second Amended Complaint neither cures the defects in pleading which Judge Barry identified in dismissing Plaintiffs' First Amended Complaint, nor does it adequately set forth a new cause of action for negligent misrepresentation. For these reasons, the Second Amended Complaint is dismissed with prejudice.

## III. DISCUSSION

### A. Standard of Review

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court may consider the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents that the plaintiff's claims are based upon. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied*, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994); *see also In re Donald Trump Casino Securities Lit.*, 7 F.3d 357, 368 n. 9 (3d Cir.1993);

*cert. denied, sub nom., Gollomp v. Trump,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Motions to dismiss under Fed. R.Civ.P. 12(b)(6) for failure to state a cause of action result in a determination on the merits at an early stage of a plaintiff's case. *See Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). As a result, "plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn." *Id.* In order to grant a 12(b)(6) motion to dismiss, the Court must find that the plaintiff will be unable to prevail even if plaintiff proves all the allegations in the complaint. The court's decision must be based solely on the legal sufficiency of the complaint. *See id.*

### B. Plaintiffs' Securities Act Claims Under Section 11, 12 and 15

In the action before the Court, Plaintiffs allege that Defendants "made a series of untrue statements and omitted to state material facts required to be stated or necessary to make the statements made relating to Ultralife's 9–volt lithium battery and, in particular, the ability of Ultralife to manufacture such batteries in sufficient quantities and in a sufficiently timely fashion to satisfy demand, not misleading." (Sec.Am.Cmplt.¶ 2.) As such, Plaintiffs have filed this claim against Defendants alleging that Defendants violated §§ 11, 12 and 15 of the Securities Act of 1933.

#### 1. Section 11 and Section 12 of the Securities Act

Section 11 provides a private right of action for false or misleading information in registration statements. "In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any such person acquiring such security

...may ...sue ...(1) every person who signed the registration statement; ...(5) every underwriter with respect to such security."[3]  15 U.S.C. § 77k(a)(1–5). Thus, § 11 provides a purchaser of securities with a private right of action against certain individuals connected with an anticipated public stock offering for material misstatements and omissions found in any portion of a registration statement which ultimately render other statements in document misleading. *See Klein v. General Nutrition Cos., Inc.*, 186 F.3d 338, 342 (3d Cir.1999); *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 923 (D.N.J.1999).

**3.** Section 11 states in pertinent part:

(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.

If such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement, then the right of recovery under

Section 12(2) of the Securities Act provides a cause of action against any person who "offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2).[4]  In other words, Section 12(2) holds liable any person who sells securities via a prospectus containing an untrue statement or omission of material fact which makes other statements in the prospectus misleading. Neither Section 11 nor Section 12 requires

this subsection shall be conditioned on proof that such person acquired the security relying upon such untrue statement in the registration statement or relying upon the registration statement and not knowing of such omission, but such reliance may be established without proof of the reading of the registration statement by such person. *15 U.S.C.* § 77k(a)(1–5).

**4.** Section 12 provides:

(a) Any person who -

(1) offers or sells a security in violation of section 77e of this title, or

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser no knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of such untruth or omission,

shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security. 15 U.S.C. § 77*l*(a).

a showing of intent or scienter, thus actions brought under these sections can sound in either fraud or negligence. *See In re Donald J. Trump Casino Securities Litigation,* 7 F.3d 357, 368 n. 10 (3d Cir. 1993); *cert. denied, sub nom., Gollomp v. Trump,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994); *Castlerock,* 68 F.Supp.2d at 485.

■ To state a claim under either Section 11 or Section 12, Plaintiffs must, at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering. *Castlerock,* 68 F.Supp.2d at 487–88; *see also Zucker v. Quasha,* 891 F.Supp. 1010, 1014, 1017 (D.N.J.1995), *aff'd,* 82 F.3d 408 (3d Cir.), *cert. denied,* 519 U.S. 825, 117 S.Ct. 85, 136 L.Ed.2d 42 (1996). Judge Barry properly dismissed Plaintiffs' prior pleading as based upon legally deficient allegations of "fraud by hindsight," and held that Plaintiffs were required to allege contemporaneous facts to support their theory that the production problems that materialized in June were actually known or knowable at the time of the 1998 public offering.

■ While Plaintiffs continued to challenge the same five statements contained in the Offering Documents as being "untrue" or "misleading," Plaintiffs once again have averred nothing to demonstrate that any of those five statements was in fact untrue. As Judge Barry aptly observed, "Plaintiffs do not argue, for example, that ULBI's profit margins did not increase or that there was not increased demand for the 9–volt battery. Neither do Plaintiffs dispute that ULBI is the only maker of 9–volt lithium batteries or that the sales of

the 9–volt lithium batteries increased." *Castlerock,* 68 F.Supp.2d at 487. Nor do Plaintiffs dispute the accuracy of the Company's stated belief that its 9–volt battery production facility "is one of the most automated and efficient lithium battery production facilities of it's kind currently operating."

The closest Plaintiffs come to any new allegation relates to the fifth statement in the Offering Documents that Plaintiffs allege was misleading (Sec. Am. Cmplt ¶ 41), that the 9–volt production facility had the "capacity" to produce nine million batteries annually. While Plaintiffs do not state that such as statement was untrue when made,[5] their Second Amended Complaint alleges a negligent omission by the Company to state the difficulties that it would have in increasing production rates to capacity levels. At the heart of Plaintiffs' claim is that Ultralife predicted that it would profit from the increased demand for it's 9–volt lithium battery arising from a pending change in legislation, and that the Company later found that its production processes were strained by its attempt to increase production to take full economic advantage of that increase in demand.

■ Plaintiffs' new allegations, while presented under a theory of negligent misrepresentation, still requires the presence of "an affirmative statement that is made misleading by the material omission." *Zucker,* 891 F.Supp. at 1014 (quoting *In re Union Carbide Class Action Sec. Litig.,* 648 F.Supp. 1322, 1326 (S.D.N.Y.1986)). To determine whether Defendants omitted a material fact which rendered statements made in the Offering Documents false or misleading, this Court "must examine the

---

5. This Court disagrees with Plaintiffs' contention that they need not plead contemporaneous facts when they bring their Section 11 claim under a negligence theory. To be sure, statements and facts can neither be fraudulently nor negligently omitted if they are unknown or unknowable at the time the Offering Documents came into effect and were disseminated. Plaintiffs appear to confuse Fed.R.Civ.P. 9(b)'s particularity requirements, implicated in fraud actions, with the require-

ments of Section 11 itself, which by the plain statutory language require that the registration statement contain a material misstatement or omission "when such part became effective." 15 U.S.C. § 77k; *see also In re MobileMedia Sec. Litig.,* 28 F.Supp.2d at 924 (D.N.J.1998). That liability cannot be imposed on the basis solely of subsequent events is no less the case when a plaintiff proceeds under a negligence theory.

relationship between the .... omissions and the affirmative statement[s] allegedly made misleading ...." *Union Carbide,* 648 F.Supp. at 1327. The Plaintiffs' Second Amended Complaint must allege how the alleged omitted fact negates the truth of or renders misleading the statements actually made.

■ Analyzed under these principles of law, the allegations of Plaintiffs' Second Amended Complaint fare no better than the allegations in their First Amended Complaint. In the Second Amended Complaint, Plaintiffs added allegations based upon an anonymous informant alleged to have been one of the primary individuals responsible for manufacturing, engineering and development at Ultralife. Plaintiffs allege that this anonymous former Ultralife employee states that Ultralife "had no real plans to actually ramp production on the 9–volt lithium battery," and that Ultralife "was not capable of ramping up production on the 9–volt lithium battery from 4 million to 9 million because the equipment .... was ten years of age" and had "extensive maintenance problems." (Sec.Am.Cmplt.¶ 49a.) Thus, the former employee opined that "Ultralife could not ramp up ... quickly enough to satisfy demand [for its 9–volt lithium battery]." (Sec.Am.Cmplt.¶ 49a.). Other than changing the theory from a theory of fraud to a theory of negligence, these allegations from an unnamed Ultralife employee constitute the only material additions that distinguish the Second Amended Complaint from the First Amended Complaint.

Nothing in these new allegations changes the conclusion rendered in Judge Barry's opinion that Defendants "never made a statement averring that they *could* 'ramp up' to meet the heightened demand." *Castlerock,* 68 F.Supp.2d 480, 487 n. 11 (emphasis supplied). The only statement made by Defendants related to the plants' *capacity* to produce 9 million batteries, a statement which Plaintiffs do not allege to be affirmatively false. Thus, Plaintiffs' Second Amended Complaint is premised upon the argument that the

Company's representation about the maximum capacity of its manufacturing plant must be read to *imply* the ability to smoothly "ramp-up" to actually produce at that capacity level. It is only the failure to add language to negate that *implied* representation that Plaintiffs allege was negligently omitted. Construing all facts and inferences in the light most favorable to Plaintiffs, as we must in the motion to dismiss, and assuming, *arguendo,* that the Defendants' statements regarding capacity included an implication that they could smoothly "ramp-up" production to capacity without the strain of increasing their production output, we must analyze whether the alleged omissions, together with what was stated, rendered the actual statement about manufacturing capacity misleading.

When the Offering Documents are scrutinized, they reveal that Defendants did not omit to state the problems that might be incurred when actual production rates would, in the future, be increased to meet the projected heightened demand. When one reads the Offering Documents, contrary to Plaintiffs' assertion that Ultralife implied that it could smoothly ramp-up production, Defendants included a precise caution to expressly negate the implied representation that forms the cornerstone of Plaintiffs' Second Amended Complaint. In the section entitled "Risks Relating to Growth and Expansion," Ultralife expressly cautioned that "[r]apid growth of the Company's advanced rechargeable battery business *or other segments of its business* may significantly strain the Company's management, operations and technical resources." (Feig Aff't, Ex. A. at 9). Because Ultralife only had two significant segments of its business— a rechargeable battery segment and the 9–volt battery segment— the reference to "other segments of its business" in the Prospectus could only mean a reference to the 9–volt battery segment of its business. Insofar as the main focus of the public offering was to raise funds for the rechargeable battery business, it was not misleading for Ultralife to refer to the 9–volt battery

business as the "other segment," since that segment was not the focus of the Company's public offering.

Ultralife further cautioned that "[t]here can be no assurance that ... its efforts to expand it's manufacturing and quality control activities will be successful or that it will be able to satisfy commercial scale production requirements on a timely and cost-effective basis." (Feig Aff't, Ex. A. at 9). Not only does this cautionary statement negate the precise implied representation upon which Plaintiffs base their Second Amended Complaint, but it constitutes an accurate prediction of precisely the "bumps in the road" that Ultralife experienced when it attempted to increase its production of 9–volt batteries to meet heightened demands.

Thus, the exact production problems that form the foundation of Plaintiffs' Second Amended Complaint were the subject of explicit cautionary language in the Prospectus. That cautionary language negated any inference that Defendants' representation of manufacturing capacity included an implied representation that such capacity could be reached by a smooth "ramp-up" of production. In other words, the inference that Plaintiffs seek to draw from the Company's statement of "capacity" is unreasonable in light of the Prospectus' express language to the contrary. Therefore, this Court concludes that Defendants did not omit to state facts necessary to render the expressed statement about manufacturing capacity not misleading. Plaintiffs cannot show that Defendants misrepresented or omitted to state existing material information which gave rise to a false or misleading impression.

### 2. *Section 15 of the Securities Act*

Section 15 of the Securities Act states, in relevant part, "Every person who ... controls any person liable under sections [11 or 12 of the Securities Act] shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 77o.[6] Thus, any person who "controls" another who is liable under Sections 11 or 12 is jointly and severally liable for the mistakes of the person they "control."

Plaintiffs allege that the Individual Defendants are liable under Section 15 because they controlled those persons who allegedly violated Sections 11 and 12(2) of the Securities Act. However, liability under Section 15 of the Securities Act hinges on liability under either Section 11 or Section 12. Having determined that Plaintiffs failed to allege sufficient facts to support a finding of liability under Sections 11 or 12 of the Securities Act, Plaintiffs' claim under Section 15 must fail.

### C. *The "Bespeaks Caution" Doctrine*

■ The "bespeaks caution" doctrine provides an alternative, independent basis for this Court to dismiss the Second Amended Complaint as a matter of law.[7] The judicially created "bespeaks caution" doctrine generally provides that "when an offering document's forecasts, opinions or projections are accompanied by meaningful

---

**6.** Section 15 of the the Securities Act states: "Every person who, by or through sock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of

which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o.

**7.** This Court's inclination regarding the applicability of the PSLRA safe harbor, *infra*, and the application of the bespeaks caution doctrine is not inconsistent with Castlerock I, *see Castlerock*, 68 F.Supp.2d at 486 n. 9, because the focus of that opinion was on the precise wording of the Offering Documents and not the "forward-looking" inferences about future production that Plaintiff seeks to draw from them in this case.

cautionary statements, the forward looking statements will not form the basis for a securities ... claim if those statements did not affect the 'total mix' of information the document provided investors." *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d at 371. "In other word, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." *Id.*

■ In this case, the statement of manufacturing capacity was a statement of presently existing fact that Plaintiff's do not challenge as false. Plaintiffs allege only that such a statement, without a further caution of potential production stresses and strains, contained an implied *forecast* of smooth production that Plaintiffs contend was negligently misleading. Plaintiffs' allegation that Defendants impliedly represented a forecast of a smoothly running production line when the future "ramp-up" would occur, is akin to a "forward-looking statement." In this case, the implication of smoothly running production was negated by "meaningful cautionary statements" about the difficulties that might well be encountered when the company increased future production to meet anticipated future demand. Thus, the "total mix" of information provided to investors was not materially misleading. *See In re Donald J. Trump Casino Securities Litigation,* 7 F.3d at 371.

### D.  *The Reform Act's Safe Harbor*

Because this Court has found no negligent misrepresentation or omission, it is unnecessary to reach the question of whether the safe harbor provision of the Private Securities Litigation Reform Act, 15 U.S.C. §§ 77z–2(c), 78u–4(b)(1), (2) (1995) (the "PSLRA") provides an alternate basis to dismiss Plaintiffs' Securities Act Claims. If this Court were to reach the question, however, it is inclined to agree with Defendants that, under the facts alleged in this case, the alleged omitted statement is a representation that Ultralife's production processes might encounter strains down the road as it pro-

ceeds to increase production of 9–volt batteries to reach capacity levels.

The PSLRA established a safe harbor protection for certain forward looking statements, which effective insulate Company's for liability under Section 11 and Section 12 in certain circumstances. *See* 15 U.S.C. § 77z–2(c). The PSLRA defines forward looking as, *inter alia,*:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission:

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);....

15 U.S.C. § 77z–2(i)(1).

This Court has already found that: (i) the risks stated in the Prospectus explicitly cautioned of precisely those problems; (ii) that the language negated any inference that those problems would not exist; and (iii) that, therefore, there was no omission to state material facts necessary to make the representation with respect to manufacturing capacity not misleading. However, this Court notes that it would be inclined to agree with Defendants that prediction about future manufacturing stresses and strain on equipment that is run harder or longer or faster to meet anticipated future heightened demand appears to be a "forward-looking statement" protected by the safe harbor provision of the

PSLRA. *See Harris v. Ivax Corp.*, 182 F.3d 799, 806 (11th Cir.1999)("There is no question under the statute that a material and misleading omission can fall within the forward-looking safe harbor.").

## V. CONCLUSION

For the foregoing reasons, it is on this 28th day of September, 2000, hereby

ORDERED that the Defendants' Motions to Dismiss be, and are hereby GRANTED; and it is further

ORDERED that this case is closed.